Nos. 14-1617, -1619

_____

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT
_____

LEXMARK INTERNATIONAL, INC.,

*Plaintiff-Cross Appellant*,

v.

IMPRESSION PRODUCTS, INC.,

*Defendant-Appellant,*

QUALITY CARTRIDGES, INC., JOHN DOES, 1–20, BLUE TRADING LLC, EXPRINT INTERNATIONAL, INC., LD PRODUCTS, INC., PRINTRONIC CORPORATION, TESEN DEVELOPMENT (HONG KONG) CO. LTD., BENIGNO ADEVA AND HIS COMPANIES,

*Defendants.*

_____

Appeals from the United States District Court for the
Southern District of Ohio in Case No. 10-CV-564
Judge Michael R. Barrett

_____

## OPENING BRIEF OF PLAINTIFF-CROSS APPELLANT
## LEXMARK INTERNATIONAL INC.

_____

TIMOTHY C. MEECE
V. BRYAN MEDLOCK, JR.
JASON S. SHULL
AUDRA C. EIDEM HEINZE
BANNER & WITCOFF, LTD.
Ten South Wacker Drive
Chicago, IL 60606
Telephone: (312) 463-5420
Facsimile:  (312) 463-5720
tmeece@bannerwitcoff.com

STEVEN B. LOY
STOLL KEENON OGDEN PLLC
300 W. Vine Street
Lexington, KY 40507

CONSTANTINE L. TRELA, JR.
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7293
Facsimile: (312) 853-7036
ctrela@sidley.com

BENJAMIN J. BEATON
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005

*Counsel for Lexmark International, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Cross Appellant certifies the following:

1.    The full name of every party represented by me is:

Lexmark International, Inc.

2.    The name of the real party in interest represented by me is:

Lexmark International, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.    The names of all law firms and the partners or associates who appeared for Lexmark International, Inc. in proceedings before the United States District Court for the Southern District of Ohio, or are expected to appear in this Court, are:

SIDLEY AUSTIN LLP
Constantine L. Trela, Jr., Benjamin J. Beaton

BANNER & WITCOFF LTD
Timothy C. Meece, V. Bryan Medlock, Jason S. Shull, Audra C. Eidem Heinze; Matthew P. Becker; Neil C. Trueman

STOLL KEENON OGDEN PLLC
P. Douglas Barr, William J. Hunter, Jr., Steven B. Loy, Anthony J. Phelps

DATE: Oct. 20, 2014               /s/ Constantine L. Trela, Jr.
                                            CONSTANTINE L. TRELA, JR.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF AUTHORITIES ..................................................................iv

STATEMENT OF RELATED CASES ................................................. viii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF ISSUES ..................................................................1

STATEMENT OF THE CASE...............................................................2

I.      Introduction.............................................................................2

II.     The Proceedings Below ...........................................................5

III.    Statement of Facts...................................................................6

        A.      The Return Program .......................................................6

        B.      The Infringement..........................................................12

        C.      This Dispute .................................................................14

SUMMARY OF ARGUMENT ............................................................17

STANDARD OR REVIEW..................................................................19

ARGUMENT ......................................................................................20

I.      A Conditional Sale Subject to a Limited License Agreement Does Not
        Exhaust All Patent Rights.......................................................22

        A.      Single-Use Restrictions, Like Lexmark's Return Program, Are
                Permitted by the Law of this Circuit and the Supreme Court.............23

                1.      This Court and the Supreme Court Have Consistently
                        Recognized that Restricted Licenses and Conditional Sales
                        Are Valid and Enforceable........................................24

                2.      Under the Law as Articulated by this Court and the Supreme
                        Court, the Return Program's Single-Use Restriction Is Valid
                        and Enforceable........................................................28

B.     The District Court Erred in Holding that *Quanta* Invalidated All Conditional Licenses ........................................................................31

       1.     The District Court's Initial Opinion Relied on a Mistaken View of the Facts ......................................................32

       2.     *Quanta* Did Not Overrule *Mallinckrodt* ....................................33

       3.     The Decision Below Relied Almost Exclusively on an Abrogated District Court Decision ...........................................37

C.     A *Per Se* Rule Barring Limited-Use Licenses Has No Justification in Law or Policy ...................................................................40

II.     The District Court Properly Held That A Sale Abroad Does Not Exhaust Domestic Patent Rights ...................................................................44

A.     The District Court Correctly Applied Binding Precedent of this Court and the Supreme Court................................................45

B.     *Kirtsaeng* Did Not Overrule *Jazz Photo* and *Boesch* ..........................48

C.     *Jazz Photo* Continues to Represent the Soundest Approach to International Exhaustion ......................................................53

CONCLUSION .....................................................................................57

ADDENDUM

Stipulated Final Judgment (June 24, 2014) ....................................A1

Order Granting 395 Motion to Dismiss for Failure to State a Claim as to Defendant Impression Products (Mar. 27, 2014) ..........................A4

Order Denying 335 Motion to Dismiss for Failure to State a Claim as to Defendant Impression Products (Mar. 27, 2014) ........................A17

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.,*
421 F.3d 981 (9th Cir. 2005) ........................................................................*passim*

*B. Braun Med., Inc. v. Abbott Labs.,*
124 F.3d 1419 (Fed. Cir. 1997) ...........................................................................26

*Bauer & Cie v. O'Donnell,*
229 U.S. 1 (1913)....................................................................................................30

*Bobbs-Merrill Co. v. Straus,*
210 U.S. 339 (1908).....................................................................................4, 50, 51

*Boesch v. Gräff,*
133 U.S. 697 (1890)......................................................................................1, 46, 47

*Bowman v. Monsanto,*
133 S. Ct. 1761 (2013)..........................................................................................49

*Conforto v. Merit Sys. Prot. Bd.,*
713 F.3d 1111 (Fed. Cir. 2013) ..........................................................................21

*Deepsouth Packing Co. v. Laitram Corp.,*
406 U.S. 518 (1972), *superseded on other grounds by statute,*
Patent Law Amendments Act of 1984, Pub. L. No. 98-622, 98 Stat. 3383,
*as recognized in Microsoft Corp. v. AT&T Corp.,* 550 U.S. 437 (2007) ...........47

*First Hartford Corp. Pension Plan & Trust v. United States,*
194 F.3d 1279 (Fed. Cir. 1999) ..........................................................................19

*Fuji Photo Film Co. v. Jazz Photo Corp.,*
394 F.3d 1368 (Fed. Cir. 2005) .............................................................44, 46, 47

*Fujifilm Corp. v. Benun,*
605 F.3d 1366 (Fed. Cir. 2010) ...................................................................39, 48

*Gen. Talking Pictures Corp. v. W. Elec. Co.,*
304 U.S. 175 (1938)...........................................................................1, 27, 28, 29

iv

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
305 U.S. 124 (1938)...............................................................23, 27, 42

*Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp.*,
123 F.3d 1445 (Fed. Cir. 1997) ................................................27, 29

*Jazz Photo Corp. v. ITC*,
264 F.3d 1094 (Fed. Cir. 2001) .................................................*passim*

*Kirtsaeng v. John Wiley & Sons, Inc.*,
133 S. Ct. 1351 (2013)..............................................................*passim*

*Kumar v. Pearson Educ., Inc.*,
133 S. Ct. 1631 (2013)....................................................................50

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*
453 F.3d 1364 (Fed. Cir. 2006), *rev'd sub nom.*
*Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008).......................34

*LifeScan Scotland Ltd. v. Shasta Techs. LLC*,
734 F.3d 1361 (Fed. Cir. 2013) ...........................................23, 27, 51

*Liu v. Pearson Educ. Inc.*,
133 S. Ct. 1630 (2013)....................................................................50

*Mallinckrodt, Inc. v. Medipart, Inc.*,
976 F.2d 700 (Fed. Cir. 1992) ..................................................*passim*

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007)....................................................47, 51, 52, 57

*Mitchell v. Hawley*,
83 U.S. (16 Wall.) 544 (1872) .........................................................28

*Monsanto Co. v. Bowman*,
657 F.3d 1341 (Fed. Cir. 2011), *aff'd*, 133 S. Ct. 1761 (2013)...................37, 49

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*,
243 U.S. 502 (1917).........................................................................31

*Ninestar Tech. Co. v. ITC*,
133 S. Ct. 1656 (2013), *denying cert.*, 667 F.3d 1373 (Fed. Cir. 2012) ............50

*Ninestar Tech. Co. v. ITC*,
  667 F. 3d 1373 (Fed. Cir. 2012) ..........................................................48

*Princo Corp. v. ITC*,
  616 F.3d 1318 (Fed. Cir. 2010) ...................................................*passim*

*Providence Rubber Co. v. Goodyear*,
  76 U.S. (9 Wall.) 788 (1869) ...............................................................28

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008)......................................................................*passim*

*Robert Bosch LLC v. Trico Prods. Corp.*,
  2014 WL 2118609 (N.D. Ill. May 21, 2014)......................................53

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
  490 U.S. 477 (1989)..............................................................................21

*San Disk Corp. v. Round Rock Research LLC*,
  2014 WL 2700583 (N.D. Cal. June 13, 2014)....................................53

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
  487 F. Supp. 2d 830 (E.D. Ky. 2007), *reconsidered and rev'd on other
  grounds*, 615 F. Supp. 2d 575 (E.D. Ky. 2009), *aff'd*,
  697 F.3d 387 (6th Cir. 2012), *aff'd*, 134 S. Ct. 1377 (2014).........................9, 10

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
  615 F. Supp. 2d 575 (E.D. Ky. 2009)............................................38, 39

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
  697 F.3d 387 (6th Cir. 2012), *aff'd*, 134 S. Ct. 1377 (2014)..............................40

*Strickland v. United States*,
  423 F.3d 1335 (Fed. Cir. 2005) .........................................................20

*Troy v. v. Samson Mfg. Corp.*,
  758 F.3d 1322 (Fed. Cir. 2014) ...................................................*passim*

## STATUTES

17 U.S.C. § 106(3) .................................................................................48

17 U.S.C. § 109(a) .................................................................................49

35 U.S.C. § 261 ................................................................................................54

35 U.S.C. § 271 ................................................................................................51

35 U.S.C. § 272 ................................................................................................54

**ADMINISTRATIVE DECISION**

*Certain Toner Cartridges & Components Thereof*,
    Inv. No. 337-TA-740 (U.S.I.T.C. Sept. 27, 2011) ..............................................14

**SCHOLARLY AUTHORITIES**

Mainak Mazumdar & Dyuti S. Banerjee, *On Price Discrimination, Parallel
    Trade and the Availability of Patented Drugs in Developing Countries*,
    32 Int'l Rev. L. & Econ. 188 (2012) .................................................................55

Guy Rub, *The Economics of* Kirtsaeng v. John Wiley & Sons, Inc., 81
    Fordham L. Rev. Res Gestae 41 (2013), *available at*
    http://fordhamlawreview.org/assets/res-gestae/volume/81/41_Rub.pdf ............55

**OTHER AUTHORITY**

U.S. Customs & Border Protection, *Importing a Motor Vehicle*, *available at*
    http://www.cbp.gov/trade/basic-import-export/importing-car (last viewed
    Oct. 16, 2014). ...............................................................................................55

## STATEMENT OF RELATED CASES

No other appeal has been taken in this civil action.

The patented products at issue in this suit are also at issue in litigation pending in the U.S. District Court for the Eastern District of Kentucky.  That case, *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, Nos. 02-571, 04-84, has produced multiple decisions of the U.S. Court of Appeals for the Sixth Circuit on questions not relevant to this appeal.  *See, e.g.,* 387 F.3d 522 (6th Cir. 2004) (copyright claims); 697 F.3d 387 (6th Cir. 2012) (Lanham Act, antitrust, and state-law claims).  The latter decision was affirmed by the Supreme Court.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) (standing under the Lanham Act).

Counsel for Plaintiff-Cross Appellant are not aware of any other cases in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a)–(b). It entered final judgment resolving all claims by the parties on June 24, 2014. (A1–3.)  Impression Products, Inc. ("Impression") filed a notice of appeal on June 26, 2014 (A3918–20), and Lexmark International, Inc. filed a notice of appeal on June 27, 2014 (A3925–27).  This Court has jurisdiction under 28 U.S.C. § 1295(a).

## STATEMENT OF ISSUES

1.     This Court and the Supreme Court have long recognized the right of a patentee to sell a patented product subject to contractual restrictions on its use, so long as the restrictions do not expand the scope of the patent.  *See, e.g., Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175 (1938); *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992).  Did the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008), which concerned the *unrestricted* sale of a patented item, *sub silentio* overrule these precedents and hold that all post-sale use restrictions are unenforceable?

2.     The Supreme Court's decision in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), interpreted section 109 of the Copyright Act to allow the importation of copyrighted books first sold abroad.  Did *Kirtsaeng* overrule *sub silentio* this Court's decision in *Jazz Photo Corp. v. ITC,* 264 F.3d 1094 (Fed. Cir. 2001), and the Supreme Court's own decision in *Boesch v. Gräff*, 133 U.S. 697

(1890), such that the doctrine of patent exhaustion now applies extraterritorially to patented items sold abroad in transactions not otherwise governed by the Patent Act?

## STATEMENT OF THE CASE

### I.      Introduction

This appeal presents a simple question of *stare decisis*: did the Supreme Court, on two occasions, and without ever saying so, overrule its own precedents and the law of this Circuit on the scope of patent exhaustion?  The answer is surely no.  And for good reason: nothing in Impression's submissions, the district court's rulings, or the Supreme Court's opinions calls into question the sensible and longstanding limitation of exhaustion to unrestricted domestic sales.

The underlying dispute arises from Lexmark's attempt to prevent Impression from selling unauthorized and infringing versions of patented toner cartridges. Lexmark initially sold these cartridges either in this country under a restricted-use license or in another country.  Impression and its suppliers, acting without authorization, refilled the spent cartridges and resold them in the United States. This infringed Lexmark's patents, as Impression concedes.  But it contends that Lexmark, having sold the cartridges, cannot enforce these patent rights.  The law of this Circuit, however, is clear: exhaustion does not apply if Lexmark sold the cartridges under a valid restricted-use license, *Mallinckrodt, Inc. v. Medipart, Inc.*,

976 F.2d 700 (Fed. Cir. 1992), or if Lexmark sold them overseas, *Jazz Photo Corp. v. ITC,* 264 F.3d 1094 (Fed. Cir. 2001) ("*Jazz Photo I*").

In response to both principles, Impression musters the same response: the Supreme Court changed the law. Two separate *sub silentio* overrulings, according to Impression, excuse its unauthorized resale of Lexmark's patented toner cartridges.

Impression's position is wrong. It rests, first, on an untenable interpretation of the Supreme Court's decision in *Quanta Computer v. LG Elecs., Inc.*, 553 U.S. 617 (2008), to treat restricted and unrestricted sales as equivalent for purposes of patent exhaustion. This reading flies in the face of the language and logic of the *Quanta* opinion, which emphasized the *lack* of a restricted license of the sort at issue here, and which cited, with approval, precedent that Impression argues *Quanta* actually overruled. *See id.* at 635–37 (citing *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175 (1938)). This Court should reverse the district court's erroneous ruling that Lexmark's patent infringement claims are barred by a prior domestic sale — even when compliance with a limited-use license is an express condition of the sale, and even when the restriction imposed by the license falls well within the exclusivity rights conferred by the patent itself.

Impression likewise proposes an unwarranted extension of *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013), which addressed copyright law's

3

statutory first-sale doctrine. Despite the Supreme Court's focus on the unique text, policy, and legislative history of the *Copyright* Act, Impression contends that the Court swept away its own precedent and the law of this Circuit concerning the extraterritorial reach of the *Patent* Act. Neither field of law, however, controls the other. *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 346 (1908). And *Kirtsaeng* failed to make any reference, even by analogy, to patent law. This Court should affirm the district court's ruling that Lexmark's initial sales abroad did not exhaust its patent rights in the United States.

Adopting Impression's overly expansive readings of these Supreme Court decisions would disrupt the stability and predictability of this Circuit's precedents. Even if the Supreme Court *had* called into question the underpinnings of the relevant decisions — and it did not — its decisions plainly were not "clearly irreconcilable" with this Court's precedent such that the district court could treat the law of this Circuit as overruled. *See Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014). Moreover, even setting aside considerations of *stare decisis*, neither the district court nor Impression identified any satisfactory justification for such radical expansions of the law of patent exhaustion. Accordingly, this Court should adhere to its precedent by reversing the district court's ruling with respect to cartridges first sold in the United States subject to a

valid single-use restriction, and by affirming its ruling with respect to cartridges first sold abroad.

## II.    The Proceedings Below

In 2010, Lexmark sued several defendants for infringement.  (*See* A106–07, A109–12(¶¶ 1, 9–12).)  The accused products are two types of toner cartridges for use in Lexmark printers — "clone" cartridges manufactured by third parties, and unauthorized "remanufactured" cartridges originally sold by Lexmark but later refurbished by third parties.  (*See* A109–10(¶ 8).)  Impression, which sells remanufactured cartridges, is the only defendant remaining in the case, all others having settled.

Impression filed two motions to dismiss: one directed to cartridges Lexmark originally sold in the United States (A1837, A1839–40), and another to cartridges originally sold abroad (A1819, A1821). The district court denied Impression's motion with respect to the foreign cartridges (*see* A17, A28), but granted the motion with respect to cartridges originally sold in this country (*see* A4, A15). Because the court's order granting the latter motion recited an erroneous understanding of the facts, the parties submitted a stipulation with a corrected statement of facts and asked the court either to reconsider its ruling in light of the stipulated facts or to enter a final judgment so that the parties could pursue an appeal.  (A2553–66.)  The court deleted the portion of the order at odds with the

stipulated facts, but otherwise declined to reconsider its ruling.  (A34–35.)  Instead, on June 24, 2014, it entered a final judgment of infringement with respect to remanufactured cartridges originally sold abroad, and a final judgment of non-infringement with respect to remanufactured cartridges originally sold in the United States.  (A1–3.)

## III.    Statement of Facts

The facts relevant to this appeal are not in dispute, and were largely stipulated below.  (*See* A2553–66.)  Lexmark is a leading developer and manufacturer of innovative imaging and information management products and services — including laser printers and toner cartridges.  (A1893(¶ 5).)  Through extensive in-house research and development, Lexmark develops most of the technology that goes into its products and services.  (A1893–94(¶¶ 6–7).)  These complex innovations are protected by numerous patents.  (A1895–96(¶ 9).)  Those at issue in this suit cover various aspects of Lexmark's toner cartridges — for example, the "encoder wheel" which determines how much toner remains in the cartridge and optimizes the print settings accordingly.  (*See, e.g.*, A696–99.)

### A.    The Return Program

Although Lexmark is known for its printers, much of its profits derive from the sale of toner cartridges to replace the cartridges that come with Lexmark printers.  (*See* A3968(12–16); A4002(3–5).)  Lexmark offers end-user customers a

6

choice when they purchase these replacement cartridges: a "Regular Cartridge" sold at full price without any use limitations, or a "Return Program" cartridge sold at a discount in exchange for the purchaser's agreement to use the cartridge only once.  (A2559(¶ 8).)

The two types of cartridges are physically identical.  (*Id.*)  But under the Return Program, customers agree that after the cartridge's toner is exhausted, they will return the empty cartridge only to Lexmark for remanufacturing or recycling. Customers who buy regular cartridges, on the other hand, pay full price, but are not subject to the single-use restriction.  They may dispose of or refill the cartridge as they see fit.  (*Id.*)  *See Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.,* 421 F.3d 981, 987–88 (9th Cir. 2005) ("*ACRA*").[1]  The Return Program cartridges cost roughly 20 percent less than the unrestricted version.  *Id.* at 983. That discount reflects the limitation on customers' use of the cartridges. (A2559(¶ 8).)

Lexmark sells Return Program cartridges directly (to end-user customers) and indirectly (through "authorized resellers").  (A2561(¶ 14).)  The Return Program contractually binds both Lexmark's authorized resellers and its customers.  No Lexmark reseller is authorized to sell a Return Program cartridge

---

[1] Lexmark previously referred to Return Program cartridges as "Prebate" cartridges.  *ACRA*, 421 F.3d at 983.

that is not subject to the single-use restriction. (A2562–64(¶¶ 16–23).) And whether a customer buys a Return Program cartridge directly from Lexmark or indirectly from an authorized Lexmark reseller, it does so subject to a user agreement that obliges the customer to use the cartridge only once. (A2559(¶ 8); A2561(¶ 14).) Given Lexmark's agreements with resellers as well as end-users, the Return Program is a restriction on both sale and use.

The use restriction — a combination patent license and contract — is clearly displayed, in multiple languages, on the outside packaging of a Return Program cartridge. (A2561(¶ 13).) *See ACRA*, 421 F.3d at 987. It also appears on Lexmark's website. (A2561(¶ 13).) Before opening the product, therefore, customers are advised that they have a choice whether to participate:

> RETURN EMPTY CARTRIDGE
> TO LEXMARK FOR RECYCLING
> Please read before opening. Opening this package or using the patented cartridge inside confirms your acceptance of the following license agreement. The patented Return Program cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for recycling. If you don't accept these terms, return the unopened package to your point of purchase. A regular price cartridge without these terms is available.

(*Id.*)

This user agreement is an enforceable contract. Both the Ninth Circuit and the U.S. District Court for the Eastern District of Kentucky have rejected

challenges to the Return Program.  The Ninth Circuit held that Lexmark's user

agreement provides customers with pre-sale notice, an opportunity to opt out, and

consideration in the form of the price discount.  *See ACRA*, 421 F.3d at 987–88 &

n.6 (Lexmark has "a facially valid contract with the consumers who buy and open

its [Return Program] cartridges.").  The Ninth Circuit also found that Lexmark's

label was not misleading.  *See id.* at 988–89 (Lexmark's statements regarding

"special" and "regular" pricing were not misleading, even if resellers rather than

Lexmark set the price of Return Program cartridges).  And the Kentucky district

court in *Static Control Components, Inc. v. Lexmark International, Inc.*, rejected

the argument that Lexmark and its customers lacked a "meeting of the minds,"

holding instead that the Return Program "clearly set[s] forth contractual terms" of

the type that have been "held to be valid."  487 F. Supp. 2d 830, 846 (E.D. Ky.

2007), *reconsidered and rev'd on other grounds*, 615 F. Supp. 2d 575 (E.D. Ky.

2009).  Neither Impression nor any other defendant in this litigation challenged the

enforceability of the Return Program on contract-law grounds.  Indeed, Impression

acknowledges that "Lexmark has an express and enforceable" contractual

agreement with each of its end-user customers and with its authorized resellers.

(A2562(¶¶ 15, 16).)[2]  All remain free, of course, to opt for a Regular Cartridge at

regular price.  (A2559(¶ 8); A2564(¶ 23).)

---

[2] Impression initially asserted that "Lexmark [did] not present any allegations that

The Return Program serves a number of important functions. *First*, it protects the quality and reputation of Lexmark's products. Many spent cartridges end up in the hands of "remanufacturers" that refill the toner and repackage the cartridge for sale. (*See infra* at 12–13.) Used cartridges refilled by third parties are susceptible to malfunctions and poor performance. (*See* A3976(1–15).) Because the malfunctions can appear to involve the printer rather than the remanufactured cartridge, customers often blame Lexmark rather than the supplier of the inferior knock-off cartridge — leading to warranty claims and fewer future purchases from Lexmark. (A3976(tr.page:21–25)–A3977(tr.page:1–17).) *Cf. ACRA*, 421 F.3d at 984.

*Second*, the Return Program facilitates Lexmark's own recycling and remanufacturing programs. In the 1990s, Lexmark began reconditioning its own spent cartridges. *See ACRA*, 421 F.3d at 983. The Return Program provides a reliable stream of cartridges for Lexmark's own remanufacturing efforts, which allow Lexmark to control the quality of its remanufactured cartridges. (*See* A3968

---

members of the consuming public are ever made aware of the fact that they are purchasing products subject to the single use restriction . . . ." (A1857.) But Impression abandoned that contention in the subsequent Stipulation, conceding the enforceability of these contracts. (A2562(¶¶ 15, 16).) And the district court in Kentucky has consistently held that Lexmark's contracts are not misleading or otherwise invalid under contract law. *See, e.g., Static Control*, 487 F. Supp. 2d at 860 ("Lexmark's [Return Program] licenses do not fail as contrary to or inconsistent with state contract law").

(tr.page:17–25) –A3969(tr.page:1–9).)  It also helps the environment by ensuring that cartridges are properly recycled if they are not reused.  (A3969(10–16).)  *See ACRA*, 421 F.3d at 984.

*Third*, the Return Program is part of Lexmark's defense against piracy and grey-market suppliers.  Lexmark's cartridges are "regionalized" such that a cartridge sold in Europe, for instance, will not work in a printer sold in North America or Latin America.  (A3942(tr.page:17–25)–A3943(tr.page:1); A3989(1–15).)  Recovering the cartridges after a single use reduces the opportunity for third-party grey-market activities.  (*See infra* at 12–13.)  Regionalization makes it harder for third parties to use a product sold at a lower price in one market to undercut sales in another, higher-priced market.  (A3943(2–11); A3989(1–9).)  And even within a region, single-use licensing limits the chances for unauthorized reuse.  Rather than restricting post-sale use across the board by imposing single-use requirements on all of its cartridges, however, Lexmark decided to give customers a choice of replacement cartridges by offering both single-use Return Program cartridges and unrestricted regular cartridges.  It accounts for the potentially negative consequences of the unrestricted cartridges by pricing them differently than Return Program cartridges.  (A2559(¶ 8); A2562(¶ 15).)

## B.    The Infringement

Each Return Program cartridge contains a computer chip that, among other things, enforces the single-use restriction.  (A2559–60(¶ 10).)  The chip monitors the cartridge's toner level: once all the toner in a Return Program cartridge is consumed, the chip stores this fact in its memory.  (*Id.*)  If the cartridge is later reinstalled, the chip will interact with the printer to disable the cartridge.  (*Id.*)

Despite this protection, piracy threatens Lexmark's cartridge sales.  Third parties, including foreign companies, have hacked Lexmark's computer chips and produced new versions that circumvent the single-use license.  (A2560(¶ 11).)  Those illegitimate chips, once installed in place of Lexmark's originals, suppress the fact that the cartridge's original toner was already consumed.  This allows a used cartridge sold by a third party to masquerade as a genuine Lexmark cartridge.  A Lexmark printer will accept the cartridge despite software designed to disable cartridges reused in violation of their single-use license.  (*Id.*)

Once the chip is circumvented, Lexmark's Return Program cartridges may be reused multiple times, in violation of the single-use restriction. "Remanufacturing" a spent toner cartridge for reuse involves replacing worn components and refilling the toner.  Companies like Impression and its suppliers gather spent cartridges, install hacked replacement chips, refill the cartridges with non-Lexmark toner, and sell the refilled cartridges for use in Lexmark printers.

(A2559–60(¶¶ 10–11).)  Although the cartridge may continue to function, the remanufacturing process, if not done correctly, will reduce its print quality over time, causing Lexmark reputational harm.  This has happened many times when third parties have refilled and resold used Lexmark cartridges.  (*See* A3976(tr.page:1–25)–A3977(tr.page:1–17).)

As a result of hacking and unauthorized remanufacturing, therefore, Lexmark's innovative printer technology is threatened by an aftermarket of low-quality knock-off cartridges.  The Lexmark cartridges at issue in this case were originally sold in the United States subject to a restricted-use license, as well as abroad.  (A1896–99(¶¶ 11–13); A2557(¶ 4).)[3]  Third-party remanufacturers, acting without Lexmark's authorization, refurbished them and refilled the toner.  Impression bought those cartridges and resold them in the United States.  (A1896–97(¶ 11); A1905(¶ 28); A2557(¶ 4).)  There is no question that, absent exhaustion, Impression's sale of remanufactured cartridges infringes Lexmark's patents.  Impression concedes that each accused cartridge literally satisfies one or more claims of the patents-in-suit.  (A2556–57(¶ 3); *see also* A29–33.)

---

[3] Depending on the country of sale, some Lexmark cartridges sold abroad are also sold subject to a restricted-use license (with customers having the option, as in the United States, to purchase regular price cartridges instead).   For purposes of this appeal, whether a foreign-sold cartridge was or was not subject to such a license is irrelevant, because Lexmark maintains, and the district court held, that foreign sales, whether restricted or not, do not exhaust U.S. patent rights.

### C.     This Dispute

In response to widespread piracy, Lexmark took legal action to protect its intellectual property, reputation, and revenues.  It first initiated proceedings in the International Trade Commission, where it obtained a general exclusion order and cease-and-desist orders barring the importation of clone, counterfeit, remanufactured, refilled, and empty Lexmark toner cartridges.  (A1892(¶¶ 2, 3).) *See Certain Toner Cartridges & Components Thereof*, Inv. No. 337-TA-740 (U.S.I.T.C. Sept. 27, 2011).

Lexmark also sued several parties for patent infringement in this action in the U.S. District Court for the Southern District of Ohio.  (*See* A106–07.)[4]   The suit targeted two types of infringement: the sale of "clone" cartridges manufactured by third parties as unauthorized copies of Lexmark's genuine toner cartridges; and the sale of other cartridges originally manufactured and sold by Lexmark, such as remanufactured cartridges that had been refilled, repackaged, and resold by third parties under non-Lexmark labels.

During four years of litigation, most defendants agreed to individual settlements with Lexmark, leading the district court to enter consent judgments and stipulated permanent injunctions.  (*See, e.g.*, A128–32 (dismissing defendant

---

[4] The operative complaint is Lexmark's Second Amended Complaint (*see* A1891–92), filed on November 1, 2013.  Impression Products was named as a defendant in the First Amended Complaint.  (*See* A1777–78.)

14

Virtual Imaging Products, Inc.).)  In some instances, the court enforced Lexmark's patent rights through contempt proceedings or default judgments.  (*See, e.g.*, A1808.)

Impression is the sole remaining defendant litigating against Lexmark.  In response to Lexmark's suit, Impression agreed that its remanufactured cartridges practiced Lexmark's patents.  (A2556–57(¶ 3).)  But it contended that the unauthorized resales did not infringe those patents because Lexmark's initial sale of the cartridges exhausted Lexmark's patent rights.  Exhaustion was therefore the sole issue advanced in Impression's two motions to dismiss, and the sole issue addressed in the district court's two decisions under review.

With respect to Lexmark cartridges first sold outside the United States, Impression maintained that Lexmark's sales abroad precluded Lexmark from suing for infringement of its U.S. patents when those cartridges were imported, remanufactured, or resold in the United States.  (A1819, A1821.)  Impression acknowledged that its position contradicted this Court's ruling in *Jazz Photo*, which held that a foreign sale does not exhaust U.S. patent rights.  (A1822.)  But Impression contended that *Jazz Photo* had been implicitly overruled by the Supreme Court's decision in *Kirtsaeng*.  The district court disagreed, noting that *Kirtsaeng* construed a distinct provision of the Copyright Act and therefore did not implicitly overrule *Jazz Photo*'s application of the Patent Act.  (*See* A17–28.)

As to Lexmark cartridges first sold in this country, Impression argued that Lexmark's patent rights were exhausted despite the express contractual conditions under the Return Program.  (A1839–40.)  Again, Impression recognized that the law of this Court was to the contrary, given *Mallinckrodt*'s holding that a sale under a single-use license did not exhaust the seller's patent rights.  (A1858.)  But the district court accepted Impression's contention that the Supreme Court's decision in *Quanta* — which addressed an *unrestricted* first sale — implicitly overturned *Mallinckrodt*'s holding regarding a *restricted* sale.  (*See* A14.)  The district court's opinion rested on its (mistaken) understanding that Lexmark resellers possess blanket authority to sell Return Program cartridges without restriction on their subsequent use.  (*Id.*)  In this respect, the court held, Lexmark's domestic sales of cartridges were analogous to Intel's sales of software without restriction in *Quanta* — sales that, as decided by the Supreme Court, exhausted patent rights.

Both Lexmark and Impression, however, recognized that the district court had misunderstood the facts concerning Lexmark's domestic sales, and that Lexmark's contracts and licenses did in fact restrict the resale of Return Program cartridges.  To avoid the need to amend the Complaint and undertake additional briefing, the parties submitted a joint motion asking the court to supplement the record with stipulated facts and then either to reconsider its decision on the Return

Program cartridges or enter final judgment to facilitate appeal. (*See* A2558–59(¶ 7).)

The district court supplemented the record with the stipulated facts, but declined otherwise to revisit its decision. (A34–35.) Instead, the court entered a stipulated judgment of non-infringement in favor of Impression with respect to Return Program cartridges first sold inside the United States, and a stipulated judgment of infringement in favor of Lexmark with respect to cartridges first sold outside the United States. (*See* A1.) The court also entered a stipulated permanent injunction, barring Impression from selling the Accused Products in the United States, except to the extent that Lexmark's patent rights had been held to have been exhausted. (A29–33.)

## SUMMARY OF ARGUMENT

Binding precedents of this Court and the Supreme Court squarely answer the questions presented in this appeal and cross-appeal. For Impression to prevail on this record, this Court would have to hold that the Supreme Court — twice — wordlessly overruled fundamental and longstanding precedents concerning patent exhaustion. The law of this Circuit, however, is not so lightly discarded. Nothing in *Quanta* or *Kirtsaeng* disturbed the rules set forth by this Court in *Mallinckrodt* and *Jazz Photo*. To hold otherwise would require this Court to conclude that the Supreme Court not only silently overruled those decisions, but also tacitly

17

overruled its own decisions in *Boesch* and *General Talking Pictures,* well-established precedents that underlie this Court's decisions in *Mallinckrodt* and *Jazz Photo*.

The district court erred in dismissing Lexmark's claim that the sale of refilled Return Program cartridges infringed Lexmark's patents.  *Quanta* was a narrow decision that, despite express invitations from, among others, the Solicitor General, did not hold that post-sale use restrictions in general are unlawful.  To the contrary, the *Quanta* opinion on its face reaffirms that only an *unrestricted* sale exhausts patent rights.  And the opinion cited — with approval — the seminal Supreme Court precedent establishing a patentee's right to condition a sale on a limited patent license.  *See Quanta*, 553 U.S. at 636 (citing *Gen. Talking Pictures*, 305 U.S. at 181).  Return Program sales, like other conditional or restricted sales that do not expand a patentee's rights beyond those conferred by the patent or otherwise improperly restrain competition, remain lawful and enforceable after *Quanta*.

The district court did, however, properly reject Impression's contention that Lexmark's foreign sales of print cartridges exhaust its patent rights in this country.  Given the Copyright Act's distinct text, structure, and history, the Supreme Court's ruling on the scope of the Copyright Act has no impact upon the foreign reach of

the Patent Act, and *Kirtsaeng* certainly created no "clearly irreconcilable" conflict freeing district courts to ignore the law of this Circuit.

The principles announced in this Court's decisions holding that patent exhaustion does not arise from domestic sales pursuant to limited-use licenses or first sales outside the United States would control here even if the questions were open for consideration now in the first instance.  Impression can offer no sound reason in law or policy to constrain a patentee's ability to contract freely within the scope of its patent, or to sell in international markets without fear of unauthorized importation into this country.  Impression's attempts to rewrite the law of this Circuit and the Supreme Court should be rejected, and the district court decisions affirmed in part and reversed in part.

## STANDARD OF REVIEW

Whether a district court properly granted a motion to dismiss for failure to state a claim upon which relief may be granted is a question of law that this Court reviews *de novo*.  *See, e.g.*, *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1286-87 (Fed. Cir. 1999).  This Court accepts the factual allegations of the complaint as true, and draws all reasonable inferences in the plaintiff's favor.  *Id.*

## ARGUMENT

On both questions presented in this appeal, the district court was obliged to apply the settled law of this Circuit.  A "trial court may not disregard its reviewing court's precedent" unless "the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision."  *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005).  Absent such an intervening change, an applicable Court of Appeals decision "controls until the circuit court overrules it en banc." *Id.*

There is no dispute that precedential decisions of this Court answer the patent-exhaustion questions put before the district court by Impression's two motions to dismiss.  *Mallinckrodt* holds that a sale subject to a single-use license — such as that used in the Return Program — does not automatically exhaust patent rights.  976 F.2d 700 (Fed. Cir. 1992).  And *Jazz Photo* makes clear that an initial sale abroad — like the foreign sales of Lexmark toner cartridges that Impression seeks to exploit — does not exhaust patent rights in the United States. 264 F.3d 1094 (Fed. Cir. 2001).  No statute or *en banc* decision has disturbed either holding, and no intervening Supreme Court decision has purported to overrule either holding.  The only question is whether *Quanta* and *Kirtsaeng* accomplished the same end without saying so.

20

The answer is surely no.  Prior Circuit precedent must be "clearly irreconcilable" with a Supreme Court decision before courts may treat it as implicitly overruled.  *Troy*, 758 F.3d at 1326; *Conforto v. Merit Sys. Prot. Bd.*, 713 F.3d 1111, 1119 (Fed. Cir. 2013) (declining to depart from "the binding law of this circuit" where intervening Supreme Court authority "does not bear on the precise question" at issue).  Far from irreconcilable, here the relevant Supreme Court authority is facially and logically consistent with this Court's precedent.

Equally important, Impression's position rests on the wholly implausible assumption that the Supreme Court also silently overruled its *own* controlling decisions.  That is flatly inconsistent with the Supreme Court's instruction to lower courts:  "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).  This principle applies with special force where, as here, the directly-applicable Supreme Court precedent does not "rest on reasons rejected in some other line of decisions," but is fully consistent with all recent authority.

Impression's overly aggressive extrapolation from Supreme Court decisions would circumvent the adversarial process.  Without the benefit of argument and

21

adjudication in its specific context, a proposition could gain the status of law of the land — beyond this Court's reach absent subsequent Supreme Court review.  This approach, moreover, would destabilize the law of this Circuit.  And even if this Court were writing on a blank slate, there is no reason to stretch the exhaustion doctrine to allow remanufacturers like Impression to expropriate for themselves Lexmark's patented innovations.

## I.     A Conditional Sale Subject To A Limited License Agreement Does Not Exhaust All Patent Rights.

The district court held that all "post-sale use restrictions" are ineffective "once goods are placed into the ordinary stream of commerce." (A14.)  That holding is incorrect for three fundamental reasons.  *First*, the district court's decision disregarded controlling Supreme Court and Circuit precedent establishing that sales subject to the Return Program conditions do not exhaust Lexmark's patent rights.  *Second*, to justify its departure from these decisions, the district court relied on recent Supreme Court authority that in fact *confirms* the propriety of sales conditioned upon limited-use licenses of the sort Lexmark granted its resellers and customers.  And, *third*, the blanket rule endorsed by the district court would restrict customer choice and hinder efforts to fight piracy — without producing any countervailing competitive or efficiency benefits.

### A.     Single-Use Restrictions, Like Lexmark's Return Program, Are Permitted by the Law of this Circuit and the Supreme Court.

Lexmark's single-use restriction is a condition expressly set forth in Lexmark's sales contracts and licenses with both resellers and customers.  Such conditional sales, absent an improper anticompetitive effect or expansion of the rights conferred by the patent itself, are expressly permitted under the law of this Circuit: "the sale of patented goods, like other goods, can be conditioned" on compliance with a "single use" restriction.  *Mallinckrodt*, 976 F.2d at 706; *see also Princo Corp. v. ITC*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (en banc) ("Th[e] 'exhaustion' doctrine does not apply … to a conditional sale or license …."); *LifeScan Scotland Ltd. v. Shasta Techs. LLC*, 734 F.3d 1361, 1375 n.8 (Fed. Cir. 2013) (distinguishing between an "unconditional transfer of ownership as opposed to a conditional sale or license" for purposes of exhaustion).  The validity of the Return Program license is likewise confirmed by the Supreme Court's decision in *General Talking Pictures* that a "patentee may grant a license upon any condition the performance of which is reasonably within the reward [of] the patent."  305 U.S. 124, 127 (1938) (internal quotation marks omitted).  These precedents, and others applying the same rule, control this case.

### 1. This Court and the Supreme Court Have Consistently Recognized that Restricted Licenses and Conditional Sales Are Valid and Enforceable.

This Court squarely upheld the validity of restricted use licenses in

*Mallinckrodt.* The plaintiff there patented, manufactured, and sold a medical

device that used aerosol to deliver therapeutic and diagnostic materials to patients'

lungs. 976 F.2d at 702. Each device carried the label "Single Use Only."

According to the manufacturer, this obliged hospitals to return the device to it for

cleaning and resale. Some hospitals instead transferred the devices to a company

that "reconditioned" the devices and returned them to the hospitals for reuse. The

manufacturer sued this third-party remanufacturer for patent infringement. The

district court dismissed, holding that the manufacturer's initial sale to hospitals

exhausted its patent rights such that "there can be no restriction on use imposed . . .

even on the first purchaser." *Id.* at 701.

This Court reversed that blanket ban on post-sale use restrictions. It held

that a single-use license is valid and enforceable unless it improperly restrains

competition or violates an independent legal restriction. The longstanding and

"clear[ly]" "legal" practice of granting limited patent licenses, the Court

recognized, did not fall under the rule that the *unconditional* sale of a patented

product exhausts the patentee's rights. *Id.* at 704-05 (citing *Gen. Talking Pictures*,

305 U.S. at 127). By recognizing that *conditional* sales may incorporate

enforceable use restrictions, this Court broadly affirmed the contractual rights of patentees and licensees to bargain over the scope of a patented item's use. As here, the patentee in *Mallinckrodt* offered its product for use on a temporally limited basis. As here, that license lasted for one use (serving, in effect, as a lease that lasted until the medical device had been used once). And, as here, the sale was conditioned on the user not transferring the used product to a third party for remanufacturing. Setting such parameters on the customer's use was not judged improper in *Mallinckrodt*, and is not in this context either.

Notably, this Court has squarely and repeatedly rejected the contrary rule advanced by Impression and adopted by the district court. Impression's position, adopted by the court below, is that "post-sale use restrictions" are *always* prohibited "once goods are placed into the ordinary stream of commerce." (A14.) In other words, any agreement between patentee and purchaser to limit a product's use is unenforceable as a matter of patent law once an end-user acquires the product. Like the district court in *Mallinckrodt*, however, the district court's decision here "misapplied precedent in holding that there can be no restriction on use imposed as a matter of law, even on the first purchaser." 976 F.2d at 701.

This Court has repeatedly applied the opposite principle. In *Princo*, decided after *Quanta,* the Court explained that sales conditioned on compliance with limited-use licenses are legally permissible and economically justified:

> As a general matter, the unconditional sale of a patented
> device exhausts the patentee's right to control the
> purchaser's use of the device thereafter, on the theory
> that the patentee has bargained for, and received, the full
> value of the goods. That "exhaustion" doctrine does not
> apply, however, to a conditional sale or license, where it
> is more reasonable to infer that a negotiated price reflects
> only the value of the "use" rights conferred by the
> patentee. Thus, express conditions accompanying the
> sale or license of a patented product, such as field of use
> limitations, are generally upheld.

616 F.3d at 1328. Only where the restriction has some improper anticompetitive or

patent-expanding effect, the Court held, does it merit special scrutiny. *Id.* On that

basis, the patentees in *Princo* could insist that users of their rewriteable-CD

technology adhere to industry standards. *See id.* at 1340.

Likewise, in *B. Braun Medical, Inc. v. Abbott Laboratories*, this Court held

that "an expressly conditional sale" subject to a "'restrictive license'" did not

exhaust the seller's patent rights. 124 F.3d 1419, 1426 (Fed. Cir. 1997) (citing

*Mallinckrodt* and *General Talking Pictures*, and rejecting claim that license could

not limit a purchaser's authority to resell or use patented intravenous valves). And

in *LifeScan*, the Court again distinguished conditional and unconditional transfers:

exhaustion could apply to products given away, *absent* an express contractual

26

restriction on the product's use. *LifeScan*, 734 F.3d at 1375 & n.8 (citing *Princo*, 616 F.3d at 1328).[5]

This Court's consistent approval of conditional licenses accords with settled Supreme Court precedent. The Supreme Court long ago held that restricted, conditional sales do not exhaust patent rights. In *General Talking Pictures*, a patentee licensed another company to manufacture and sell patented sound amplifiers. 304 U.S. at 179–80. Although the equipment could be used either for commercial or for private purposes, the license was limited to non-commercial use. *Id.* at 179. After the licensee sold the amplifiers to a commercial user, the patentee sued the buyer (who knew of the licensee's restriction) for infringement. *Id.* at 180. Because the field-of-use restriction did not "extend the scope of the monopoly," *id.* at 181, and because the licensee had clearly violated the non-commercial-use restriction, the sale was unauthorized and thus did not exhaust the patentee's rights. The Supreme Court therefore upheld the patentee's right to sue for infringement. On rehearing, the Court confirmed its ruling: "That a restrictive license is legal seems clear." 305 U.S. at 127. In support of this proposition, the Court relied on several prior cases that had endorsed the validity of limited-use

---

[5] *See also Jazz Photo I,* 264 F.3d at 1107–08 ("a contractual agreement by the purchaser," but not the seller's mere warning or intent, may limit the purchaser's reuse of a patented product); *Hewlett–Packard Co. v. Repeat–O–Type Stencil Mfg. Corp.*, 123 F.3d 1445, 1453 (Fed. Cir. 1997) (enforceable contract is required to "limit[] … the right of a purchaser to use, sell, or modify a patented product").

licenses. *See, e.g.*, *Mitchell v. Hawley*, 83 U.S. (16 Wall.) 544, 548 (1872) (recognizing permissibility of sales conditioned on compliance with a use restriction); *Providence Rubber Co. v. Goodyear*, 76 U.S. (9 Wall.) 788, 799–800 (1869) (license authorized only a specified use of the patented product). As this Court later would, the Supreme Court squarely rejected the proposition that patent law did not permit post-sale restrictions on use. *Gen. Talking Pictures*, 304 U.S. at 180–82, 185–86 (rejecting position of Black, J., dissenting); *see also Mitchell*, 83 U.S. at 546, 550 (rejecting argument that "a sale of machines by the patentee … operated to take *the thing sold* out of the reach of the Patent Act altogether, and that as long as the machines themselves lasted, the owner could use them").

> **2.    Under the Law as Articulated by this Court and the Supreme Court, the Return Program's Single-Use Restriction Is Valid and Enforceable.**

These decisions confirm that sales subject to the Return Program do not exhaust Lexmark's patent rights. Indeed, the Return Program stands on *stronger* footing than the limited-use licenses at issue in *General Talking Pictures* and *Mallinckrodt* because it is a restriction on both use and sale. It is undisputed — indeed, stipulated — that Lexmark's authorized resellers and end-user customers all agreed to a valid and enforceable contract incorporating the terms of the Return Program, under which customers agreed to use the cartridge only once in consideration for paying a lower up-front price. (*See* A2559(¶ 8); A2562–

64(¶¶ 15–23).)  Either counterparty could decline to participate in the Return

Program and instead buy a regular cartridge, with no use restrictions, at full price.

(*See* A2559 ¶ 8; *supra* at 7–9.)  The restriction at issue in *General Talking*

*Pictures*, by contrast, bound only the retailer and not the end-user.  304 U.S. at 181

(the licensed dealer lacked authority to sell for commercial use).  And in

*Mallinckrodt* the patentee unilaterally imposed the single-use restriction at issue.

*See* 976 F.2d at 703, 709 (remanding to determine whether seller's "notice" of

restriction was a valid condition on sale).[6]  Yet both cases rejected arguments that

the limited-use restriction was automatically invalid as applied to end-users.  The

limited-use restriction in the Return Program is likewise valid and enforceable.

That limited licenses are generally enforceable in patent law does not, of

course, mean they are always enforceable.  A specific restriction may be set aside

on a showing that it expands the scope of the patent monopoly.  *See, e.g., Gen.*

*Talking Pictures*, 304 U.S. at 181; *see also Mallinckrodt*, 976 F.2d at 706, 709

(remanding for consideration of whether the condition improperly restrained

competition and requiring a factual showing of market power and anticompetitive

---

[6] *See also Jazz Photo I*, 264 F.3d at 1106 (enforceable contract, not mere unilateral
intent, is required to limit buyer's right to use patented product); *Hewlett-
Packard,* 123 F.3d at 1453 ("a seller's intent, unless embodied in an enforceable
contract, does not create a limitation on the right of a purchaser to use, sell, or
modify a patented product so long as a reconstruction of the patented combination
is avoided").

effect); *Princo*, 616 F.3d at 1334 (requiring parties challenging license to make a factual showing of anticompetitive effect). To the extent the rule of *General Talking Pictures* and *Mallinckrodt* might raise concerns in other cases about the effect of restrictive licenses, the law already accounts for such risks.

No such considerations are at issue here. Impression has not alleged that the Return Program improperly restrains competition in a relevant market, or that Lexmark has misused its patents or expanded their scope.[7] Nor could it: Lexmark lacks market power, and customers are free to choose an unlimited-use cartridge. Moreover, the single-use restriction merely limits the use of the patented article itself and therefore is well within the scope of Lexmark's patent rights. It does not fix prices or "leverage" a patented product to affect the market for other, unpatented items, as in a tying case. *See Mallinckrodt*, 976 F.2d at 704 (collecting price-fixing and tying cases in which use restrictions were held unenforceable); *cf. Bauer & Cie v. O'Donnell*, 229 U.S. 1, 17 (1913) (license that effectively fixed

_____

[7] Initially, Impression's motion-to-dismiss papers broadly asserted, without support or explanation, that Lexmark acted with the "improper purpose" of inducing customers to buy new rather than remanufactured Lexmark cartridges (A1875–76), and that the Return Program was "imposed upon unsuspecting consumers … not for any valid patent related purpose" (A1856, A1858). But Impression did not identify any respect in which the Return Program somehow expanded Lexmark's rights beyond the rights conferred by its patents, or improperly restrained competition. To the contrary, Impression subsequently stipulated that customers are on notice of the single-use condition when they purchase a Return Program cartridge, and that they have the option of purchasing a Regular Cartridge at full price. (A2559(¶ 8); A2561(¶ 13); A2562(¶ 15).)

prices held invalid); *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 515–16 (1917) (license requiring use of unpatented items invalid). Unlike in *Mallinckrodt*, no additional review or remand is necessary here because Impression does not and cannot identify any way in which the Return Program expands the scope of Lexmark's patents.  Because the license imposes a condition "'within the reward which the patentee by the grant of the patent is entitled to secure'" — that is, a restriction on the frequency of use of Lexmark's patented toner cartridges — that license is enforceable when incorporated into the contract under which the product is sold.  *See Mallinckrodt*, 976 F.2d at 704–05 (quoting *Gen. Talking Pictures*, 305 U.S. at 127).

> ### B.      The District Court Erred in Holding that *Quanta* Invalidated All Conditional Licenses.

Despite this settled precedent, the district court held the Return Program's single-use license was unenforceable because it imposed a post-sale limitation on use.  That holding rested upon a misunderstanding of the facts, a misreading of the Supreme Court's decision in *Quanta*, and misplaced reliance on an abrogated district court opinion.

### 1. The District Court's Initial Opinion Relied on a Mistaken View of the Facts.

As to the facts, the district court initially stated that resellers of Lexmark cartridges were free as a contractual matter to sell Return Program cartridges irrespective of their post-sale use:

> Lexmark does not allege that the authority of the sellers of the Return Program cartridges were restricted or conditioned in any way. In other words, the facts alleged by Lexmark do not suggest that the sellers had anything other than full authority to sell the Return Cartridges that practiced Lexmark's patents.

(A14.) Absent a contractual limitation on the uses for which the cartridges could be sold, the court reasoned, sales by resellers to end-user customers for any and all uses were fully authorized, unrestricted, and thus exhausted Lexmark's patent rights. (*Id.*) In this respect, the court held, Lexmark's sales were factually indistinguishable from the unconditional sales held to exhaust patent rights in *Quanta*, discussed below at 33–37. (*Id.*)

But, as explained above, Return Program sales to resellers and end-user customers *are* governed by contractual agreements that include the Return Program's single-use license. (*See supra* at 7–9.) On this point, there is no dispute: the parties stipulated that Lexmark sells Return Program cartridges to authorized resellers under "an express and enforceable contract" "that bind[s] each [reseller] to the Return Program condition," and to end-user customers "subject to

express contractual conditions and a conditional single-use license for which Lexmark receives reduced compensation."  (A2559(¶ 8); A2562–64(¶¶ 16–23)).) In response to the parties' stipulation and motion for reconsideration, the district court struck from its order the two sentences quoted above.  (A34–35.)  But despite eliminating the factual basis for its decision to equate the facts in *Quanta* with Lexmark's Return Program, the court declined without explanation to revisit its legal ruling.  (*See* A1–3 (entering stipulated final judgment).)

### 2.    *Quanta* Did Not Overrule *Mallinckrodt*.

With the erroneous factual basis for its ruling gone, only one justification remained for the court's decision: its determination that *Quanta* overruled this Court's decision in *Mallinckrodt*.  "[T]o the extent that *Mallinckrodt* holds that such post-sale use restrictions preclude patent exhaustion after an authorized sale, the Court agrees … that *Mallinckrodt* was overruled by *Quanta* sub silentio." (A14–15.)  Because the resellers were "authorized" to sell Return Program cartridges, the court held, restricted licenses that accompanied those sales were unenforceable.  (*Id.*)[8]

This interpretation, however, misreads *Quanta*, which did not mention, much less overrule, *Mallinckrodt*.  Nor did it announce a broad rule that *any*

---

[8] *See also* A12 ("Lexmark attempts to reserve patent rights in its products through post-sale restrictions on use imposed on its customers, which is what *Quanta* says Lexmark cannot do.") (internal quotation marks and alterations omitted).

authorized sale, no matter how the authority may be expressly limited, bars *all* post-sale use restrictions. To the contrary, *Quanta* embraced the distinction between restricted and unrestricted sales that underlies *Mallinckrodt* and *General Talking Pictures* — confirming that only unrestricted sales exhaust patent rights.

*Quanta* concerned LGE's rights in computer-technology patents that it licensed to Intel for the manufacture and sale of processors and computer chips. 553 U.S. at 623. That transaction was governed by two agreements: a License Agreement that expressly disclaimed any limitation or alteration of patent exhaustion, and a Master Agreement that did not restrict Intel's ability to sell LGE products other than to require Intel to provide notice that its customers were not authorized to combine Intel products practicing the LGE patents with non-Intel products. *Id*. at 623–24. When Quanta bought Intel processors and combined them with non-Intel parts, LGE sued Quanta for infringement.

After holding that exhaustion applies to method patents such as LGE's, the Supreme Court went on to consider whether LGE's rights in those patents had been exhausted. *Id.* at 635–36. This Court's decision under review had held that, under the *Mallinckrodt* line of cases, exhaustion did not apply because the chip sales were conditioned upon compliance with a restricted license. *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1369–70 (Fed. Cir. 2006). The Supreme Court did not question the legal principle applied in *Mallinckrodt*. To the contrary, it

34

confirmed that an "authorized" and "*unconditional* sale" was required to exhaust LGE's rights.  *See* 553 U.S. at 625–26 (emphasis added) ("reiterat[ing] the rule that 'the right to vend is exhausted by a single, unconditional sale'") (quoting *Motion Picture Patents*, 243 U.S. at 516).  And it discussed — with approval — its own decisions in *General Talking Pictures*, which authorized conditional patent licenses that impose post-sale use restrictions.  *See Quanta*, 553 U.S. at 636.  As discussed above, that precedent directly supported this Court's decision in *Mallinckrodt*.

The Supreme Court instead held as a matter of *contract interpretation* that LGE's sales to Intel were not conditioned upon a limited-use license: Intel's license to sell products employing the LGE patents was not contingent upon how those products were to be used by its customers or whether they were used in a way that violated LGE's restriction.  *Id.* at 636–37.  Intel was required only to give notice of the restriction, which it did.  And even that obligation was not a condition of the License Agreement.  *Id.*  Thus, the sales exhausted LGE's patent rights under the *Mallinckrodt* framework, because they were not subject to any use restriction or other condition — they were authorized, unrestricted sales.  The Court's analysis therefore focused not on a revision to the law of patent exhaustion, but on the effect of the parties' particular contracts:

- "[E]xhaustion turns … on Intel's own license."  *Id*. at 637.

- "No conditions limited Intel's authority to sell products substantially embodying the patents." *Id.*

- "Nothing in the License Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts." *Id*. at 638.

In other words, the Supreme Court did not disturb the major premise of this Court's decisions in *Quanta* or *Mallinckrodt* (that only an authorized, unconditional sale exhausts patents rights), but rather reversed the minor premise (that Intel's sale had in fact not been authorized and unconditional).

This entire exercise in contract interpretation would have been unnecessary had the dispositive question been, as the court below thought in this case, whether an authorized sale of any kind had occurred.  If the *per se* rule the district court applied to Lexmark were the law, the Supreme Court's task would have been exceedingly simple: because Intel was authorized to sell products covered by the LGE patents, *any* post-sale restriction on the use of those products would have been a nullity.  The Court easily could have disposed of the case by overruling *Mallinckrodt*'s approach to exhaustion and disregarding as irrelevant the specific terms of the LGE/Intel agreements.  This option was hardly hidden:  petitioners and *amici* in the Supreme Court (including the Solicitor General) expressly invited

the Court to overrule *Mallinckrodt*, *see, e.g.,* Br. of Amicus Curiae United States at *23–24, 2007 WL 3353102 (Nov. 13, 2007).

Far from overruling *Mallinckrodt*, however, *Quanta* confirms that Return Program sales do not exhaust Lexmark's rights.  It is impossible to conclude that *Quanta* implicitly rejected *Mallinckrodt* if *General Talking Pictures* remains good law — and *Quanta* plainly indicates that *General Talking Pictures* remains good law.  *Quanta* and *Mallinckrodt* are not "clearly irreconcilable," such that *Mallinckrodt* may simply be ignored.  *Troy*, 758 F.3d at 1326.  The correct reading is that *Mallinckrodt* remains the authoritative law of this Circuit.  Which is why this Court, since *Quanta* issued, has continued to treat *Mallinckrodt* as binding precedent.  *See, e.g.*, *Princo,* 616 F.3d at 1328; *Monsanto Co. v. Bowman*, 657 F.3d 1341, 1347 (Fed. Cir. 2011), *aff'd*, 133 S. Ct. 1761 (2013).

### 3.    The Decision Below Relied Almost Exclusively on an Abrogated District Court Decision.

The district court's opinion in this case did not discuss *Quanta* at any length. Instead, it simply adopted another district court's analysis of the Return Program and *Quanta*.  (*See* A14 ("[T]he Court is persuaded to follow the reasoning of the district court in *Static Control II*.").)  That analysis cannot be reconciled with the facts of *Quanta* or the law of this Circuit.

*Static Control Components, Inc. v. Lexmark International, Inc.* is an ongoing dispute between Lexmark and a maker of computer chips used to hack Lexmark's

Return Program cartridges.  On the question of exhaustion, the district court in
*Static Control* had first agreed with Lexmark that the Return Program condition
was enforceable and that Return Program sales thus did not exhaust Lexmark's
patent rights.  615 F. Supp. 2d at 578 (E.D. Ky. 2009) (citing Doc. 1008, No. 02-
571).  On reconsideration, however, the district court concluded that *Quanta*
"represents a change in the law" by "reassert[ing] a broad understanding of patent
exhaustion in the face of Federal Circuit case law." *Id.* at 582.  This new rule, the
*Static Control* court held, broadly barred "attempt[s] to impose conditions on the
use of … products after a fully authorized sale." *Id.* at 584.

That decision provides no support for setting aside the rule of *Mallinckrodt*
and *General Talking Pictures*.  The *Static Control* district court paid scant attention
to the contract interpretation that the Supreme Court found dispositive in *Quanta*.
Instead, it teased from *Quanta*'s background discussion of several exhaustion
precedents a principle never articulated or applied in *Quanta* itself: that patentees
"may not invoke patent law to enforce restrictions on the post-sale use of their
patented products." *Static Control*, 615 F. Supp. 2d at 582.[9]  This led it to perceive

---

[9] The *Static Control* opinion repeatedly emphasized an inapposite distinction
between restrictions on sales and restrictions on use.  *See* 615 F. Supp. 2d at 584
("According to the Supreme Court, then, the LGE-Intel agreement did not impose
conditions on the sale of the patented products, but rather attempted to impose
conditions on the use of those products after a fully authorized sale."); *id.*
(Lexmark may not "attempt[] to reserve patent rights in its products through post-
sale restrictions on use imposed on its customers."); *id.* at 584–85 ("Lexmark

in *Quanta* a "broad statement of the law of patent exhaustion," *id.* at 586, though in fact the Supreme Court declined the opportunity to expound on general principles of exhaustion in favor of a narrow contract-based ruling (*see supra* at 35–36). *See Fujifilm Corp. v. Benum*, 605 F.2d 1366, 1371–72 (Fed. Cir. 2010) (per curiam) (recognizing *Quanta* did not impose a rule of "strict exhaustion"). Thus, the district court erroneously interpreted *Quanta* to announce a new rule of exhaustion law when the Supreme Court in fact simply applied existing doctrine to the particular contracts at issue.

Reliance on the *Static Control* district court decision is misplaced for other reasons as well. First, *Static Control* described Lexmark's sales as unconditional and unrestricted, a mistake of fact similar to the one corrected by the stipulation in this case. (*See supra* at 32–33.)[10] Second, the Sixth Circuit abrogated rather than

---

confuses the distinction made in *Quanta* between conditions restricting the right to sell … and post-sale conditions on use."). No such distinction informed the Supreme Court's decision in *Quanta* and, in any event, here both the product's sale *and* use are contractually restricted.

[10] *See Static Control*, 615 F. Supp. 2d at 585 (footnote omitted):

> Sales of Lexmark Prebate cartridges were unconditional. Anyone could walk into a store carrying Lexmark Prebate cartridges and purchase one. Anyone could purchase Lexmark Prebate cartridges directly from Lexmark through its website. No potential buyer was required to agree to abide by the Prebate terms before purchasing a cartridge. Thus, sales of Lexmark's Prebate toner cartridges were authorized and unconditional, just like sales of LGE's patented products in *Quanta*. As

affirmed the district court's decision in *Static Control*. *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 421 (6th Cir. 2012) (concluding that "this extremely complex and unsettled question" was of "no relevance to the outcome of th[e] appeal."). Finally, the *Static Control* court never addressed the requirement that an intervening Supreme Court decision be "clearly irreconcilable" with Circuit precedent before the law of this Circuit may be set aside. *See Troy*, 758 F.3d at 1326. As shown above, the Supreme Court's decision in *Quanta* is perfectly reconcilable with *Mallinckrodt*. *Quanta* cannot be read to have the broad yet unspoken impact perceived by *Static Control* and the decision below.

## C.    A *Per Se* Rule Barring Limited-Use Licenses Has No Justification in Law or Policy.

Approving the district court's acceptance of Impression's end-run around *Mallinckrodt* and *General Talking Pictures* would destabilize the law of the Circuit. Countless individuals and businesses rely on this Court's decisions in arranging their affairs — particularly in the context of patent law, where parties look to this Court for authoritative direction. That reliance depends on certainty that case law remains authoritative absent an intervening *en banc* decision, Supreme Court ruling, or Act of Congress. This Court has accordingly established

---

such, sales of Lexmark cartridges exhausted Lexmark's patent rights in them, stripping Lexmark of the ability to control post-sale use of the cartridges through patent law.

the high bar of "clearly irreconcilable" conflict before a precedent is set aside as implicitly overruled. *Troy*, 758 F.3d at 1326. As shown above, there is no "clearly irreconcilable" conflict here.

But even if the Court were writing on a blank slate, the rule advanced by Impression and adopted by the district court is unjustified. A broad exhaustion principle that bars all post-sale use restrictions would restrict parties' freedom of contract without any countervailing efficiency or competition benefits.

At the outset, there is no question that a patentee is free to offer products whose technical or physical properties allow for only one use. *See, e.g., Jazz Photo I*, 264 F.3d at 1098 (disposable cameras). Single-use razor blades and contact lenses are everyday examples. Lexmark produced toner cartridges that would similarly be capable of only a single use. Hackers and pirates circumvented the chips that enforced this limit, but that fact did not somehow make the single-use design illegitimate. There is no sound reason in logic or policy why the same end cannot be achieved through law rather than technology. If Lexmark's computer chips were lawful before they were hacked (as they undoubtedly were), why should Lexmark be barred from enforcing the same single-use restriction in court? Yet this is the misguided rule the decision below would impose.

That the single-use limitation derives from a contract makes the Return Program particularly unobjectionable. In agreeing to a contract, both the patentee

and licensee or customer play a role in choosing the parameters of the desired use. Just as customers pay a price for a single-use razor or throwaway contact lens that reflects its limited lifespan, so too Lexmark's customers may choose to pay a reduced price for a single-use cartridge or full price for an unrestricted cartridge. Because most end-users have no interest in refilling and reusing print cartridges, the Return Program makes it possible for them to buy, and pay for, only what they actually want: use of one full cartridge. Meanwhile, the single-use license facilitates Lexmark's efforts to address environmental, quality, and piracy concerns, and to sell its own remanufactured cartridges. (*See supra* at 10–11.) As this Court recognized in *Princo*, scaling prices according to use allows a buyer to purchase only what he wants, 616 F.3d at 1328, which increases customer choice and satisfaction.

The court below did not point to any ill effects created by licenses that restrict the post-sale use of patented products. This is particularly noteworthy given the long history of limited-use licensing; even in 1938 the practice was described by the Supreme Court as "old," *see Gen. Talking Pictures*, 305 U.S. at 127. The purported risk that widespread infringement liability will be imposed on unwitting users is a red herring. (*See* A15.) Even in the (highly conjectural) event of enforcement against individual customers, there is little risk of "uncertainty" (*id.*) over whether a cartridge was reconstructed and resold by a third-party, rather

than returned to Lexmark.  Indeed, had pirates not tampered with Lexmark's computer chips, there would be *no* risk of commingling licensed and unlicensed products in the stream of commerce because the Return Program cartridges would not be reusable.  (*See supra* at 12–13.)  In any event, the risk of unwitting infringement is *always* present when patented goods circulate in commerce.  In this case, that risk is no higher with a remanufactured Lexmark cartridge than with an unauthorized "clone" copy — which is undeniably subject to infringement liability.  (*See supra* at 14.)

Rather than eliminate all post-sale limited-use licensing through a blanket ban, the law of this Circuit accounts for any risks in other ways.  Examining a specific license itself, as discussed above at 29–31, offers a far more precise tool with which to guard against a patentee's attempt to secure rights beyond those conferred by the patent.  To be clear, such considerations do not apply to the types of transactions at issue in this case, which do not expand the scope of the patents.  This is clear from the nature of the Return Program agreement and from the stipulation below.  (*See supra* at 30–31.)  But in other situations where the facts are less clear, the law already polices any risk of anticompetitive effect.  Even if considerations of *stare decisis* were not dispositive, therefore, there is no basis for this Court to adopt the *per se* prohibition on post-sale use restrictions embraced by the court below.

**II.    The District Court Properly Held That A Sale Abroad Does Not Exhaust Domestic Patent Rights.**

The second question presented — whether the foreign sale of a patented article exhausts U.S. patent rights — is likewise squarely answered by binding precedent.  Recent decisions of this Circuit, as well as longstanding Supreme Court caselaw, make clear that a sale abroad does not eliminate a patentee's ability to enforce its rights domestically.  *See, e.g., Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed. Cir. 2005) ("*Jazz Photo II*") (citing *Boesch v. Gräff*, 133 U.S. 697, 701–03 (1890)).

Impression's only response is to note that a different rule would apply in the copyright context.  (Opening Br. 5 (citing *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2013)).)  But neither the specific reasoning of *Kirtsaeng*, nor general principles of copyright law, extend to the patent context.  Certainly *Kirtsaeng* is not "clearly irreconcilable" with this Court's precedent such that the district court or a panel of this Court may set aside binding Circuit law.  (*See supra* at 21–22.)  And limiting the exhaustion of U.S. patent rights to domestic sales is the right rule in any event.  The district court's decision on this issue (A17–28) should be affirmed.

A.     **The District Court Correctly Applied Binding Precedent of this Court and the Supreme Court.**

Impression contended below that patent exhaustion immunized from infringement liability its resale in the United States of remanufactured cartridges originally sold outside the United States.  The district court properly rejected that defense, recognizing the straightforward rule that "the patent exhaustion doctrine" — like patent law generally — "is territorial."  (A19.)  Thus, "[i]n order for patent exhaustion to apply, the authorized first sale must have occurred in the United States."  (*Id.*)

As Impression concedes, the district court's analysis followed the law of this Circuit: "Under *Jazz Photo*, if a patented product is first sold outside of the United States, the patent rights are not extinguished."  (Opening Br. 3.)  The *Jazz Photo* decisions involved a fact pattern similar to that at issue here: the unauthorized importation and resale of spent disposable cameras that had been sold abroad for a single use, but then remanufactured to allow for additional uses.

In *Jazz Photo I*, the question was whether this remanufacturing represented permissible "repair" or impermissible "reconstruction."  264 F.3d at 1098–99.  This Court held that remanufacturing was permitted with respect to cameras first sold in the United States, because those initial unrestricted domestic sales exhausted the patentee's rights.  *Id.* at 1105.  But reimportation was *not* permitted with respect to cameras first sold overseas, because "United States patent rights are

45

not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." *Id.*

*Jazz Photo II* reaffirmed the exhaustion doctrine's territorial limitations. In a 2005 appeal in the same proceeding, this Court clarified that exhaustion did not turn on whether the original foreign sale occurred with or without the patentee's authorization:

> The patentee's authorization of an international first sale does not affect exhaustion of that patentee's rights in the United States….
>
> [O]nly [cameras] sold within the United States under a United States patent qualify for the repair defense under the exhaustion doctrine. . . . In *Jazz* [*Photo I*], therefore, this court expressly limited first sales under the exhaustion doctrine to those occurring within the United States.

*Jazz Photo II*, 394 F.3d at 1376 (internal citations omitted). Impression offers no legal or factual basis to distinguish the *Jazz Photo* decisions from this case, and it is right not to attempt to do so.

Impression is wrong, however, to describe those decisions as "creat[ing] an unprecedented exception to the . . . patent extinguishment doctrine." (Opening Br. 3.) This territorial limit is far from "unprecedented," and in fact is a longstanding principle of patent law — as was made clear by this Court's reliance in *Jazz Photo I* and *II* on the Supreme Court's 1890 decision in *Boesch v. Gräff*, 133 U.S. 697.

46

*Boesch* addressed whether importers were liable for infringement based on unauthorized U.S. resales of lamps lawfully purchased from a third party in Germany. The Supreme Court determined that the overseas sale, under a foreign patent regime, did not authorize a U.S. resale over the U.S. patentee's objection. *Id.* at 703. This was a function of the limited geographic scope of the U.S. patent laws. As the district court recognized in the decision here (A19), under *Boesch* "an authorized sale of a good patented by another under the laws of a foreign country does not exhaust the patent rights of the United States patentee, and the United States patentee may sue for infringement when that good is imported into the United States for sale."

The decisions in *Jazz Photo* and *Boesch* are consistent with the "traditional understanding that our patent law operates only domestically and does not extend to foreign activities." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 455 (2007) (alterations and internal quotation marks omitted).[11] *Jazz Photo II* expressly relied on the fact that "the United States patent system does not provide for extraterritorial effect." 394 F.3d at 1376 (citing *Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1360 (Fed. Cir. 2004)). This Court has repeatedly

---

[11] *See also Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 531 (1972) ("Our patent system makes no claim to extraterritorial effect; 'these acts of Congress do not, and were not intended to, operate beyond the limits of the United States,'… and we correspondingly reject the claims of others to such control over our markets." (quoting *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195 (1856))).

reaffirmed this geographic limitation since *Jazz Photo*. *E.g., Ninestar Tech. Co. v. ITC*, 667 F. 3d 1373, 1378 (Fed. Cir. 2012).[12]

The rule of *Jazz Photo* and *Boesch*, therefore, directly controls the outcome here: Impression cannot, by virtue of Lexmark's foreign sale, resell Lexmark's patented cartridges in the U.S. without regard for Lexmark's rights under U.S. patent law.

### B.    *Kirtsaeng* Did Not Overrule *Jazz Photo* and *Boesch*.

To overcome this well-settled law, Impression repeats the tactic it deployed in the context of domestic sales: it contends that a recent Supreme Court decision silently overruled otherwise controlling adverse precedent. Its effort to manufacture a *sub silentio* overruling, however, fares no better in the foreign context than in the domestic. The district court correctly recognized that the Supreme Court's decision in *Kirtsaeng* was not "plainly inconsistent" with the controlling law of this Circuit, and that *Jazz Photo* remains good law. (A23.)

*Kirtsaeng* involved a student's sale in the United States of copyrighted textbooks bought in Thailand. 133 S. Ct. at 1356. The question was whether the student's unauthorized importation infringed the publisher's rights under the Copyright Act, *see* 17 U.S.C. § 106(3), or was instead protected by the Act's first-

---

[12] This Court also has made clear that *Quanta* did not alter the extraterritoriality rule of *Jazz Photo*. *See Ninestar*, 667 F.3d at 1378; *Fujifilm*, 605 F.3d at 1371–72 (*Quanta* "did not eliminate the first sale rule's territoriality requirement").

sale provision, § 109(a).  133 S. Ct. at 1355.  The Copyright Act's first-sale

provision allows "the owner of a particular copy or phonorecord lawfully made

under this title . . . without the authority of the copyright owner, to sell or

otherwise dispose of that copy or phonorecord."  17 U.S.C. § 109(a).

After examining in exhaustive detail whether a textbook printed and sold

abroad was "lawfully made under" the Copyright Act, the Court concluded that the

Act did not geographically limit the first-sale provision to sales made in the United

States.  Thus, the foreign textbooks had been lawfully resold in the United States.

In reaching this conclusion, the majority, concurrence, and dissent considered

§ 109's text, context, legislative history, common-law background, and practical

effects.  133 S. Ct. at 1358, 1364.

It is entirely implausible that the Supreme Court in *Kirtsaeng* overhauled the

international patent regime in the silent, haphazard manner suggested by

Impression.  First, and most obviously, *Kirtsaeng* addressed the Copyright Act

rather than the Patent Act.  The Supreme Court's opinion never mentioned patent

law, even by analogy.[13]  It never hinted at any tension with *Jazz Photo* or its own

decision in *Boesch*.  And precedent of the Supreme Court (cited approvingly in

*Kirtsaeng* on other points, *see id.* at 1363, 1367) makes clear that patent and

---

[13] This omission is particularly telling given that patent law was fresh on the
Justices' minds.  *Kirtsaeng* was decided only one month after the Justices
considered patent exhaustion in *Monsanto v. Bowman*, 133 S. Ct. 1761 (2013).

copyright decisions are not interchangeable.  *See Bobbs-Merrill*, 210 U.S. at 346

("the cases which relate to the one subject are not altogether controlling as to the

other.").[14]

Second, *Kirtsaeng* turned on an interpretation of the Copyright Act's

distinctive statutory provision regarding first sales.  *See* 133 S. Ct. at 1358–64

(construing § 109(a)'s reference to copies "lawfully made under this title").  That

Congress in 1947 substituted "lawfully made" for "lawfully obtained," and in 1987

repealed a "manufacturing clause" limiting importation of foreign-produced

copies, for example, indicated to the majority that Congress intended no

geographical limit in enacting § 109(a).  *Id.* at 1360, 1361.  The Patent Act, by

contrast, contains no analogous provision codifying the exhaustion doctrine.  The

exhaustion defense and its limits derive instead from judicial decisions applying,

among other things, the Patent Act's recognized lack of extraterritorial force.  *See,*

*e.g., Jazz Photo I*, 264 F.3d at 1105 (considering whether sale abroad was a

---

[14] In the wake of *Kirtsaeng*, moreover, the Supreme Court apparently recognized the dispositive distinction between patent and copyright law.  The Court granted, vacated, and remanded in two copyright cases so the Court of Appeals could review its decisions in light of *Kirtsaeng*.  *See Kumar v. Pearson Educ., Inc.*, 133 S. Ct. 1631 (2013); *Liu v. Pearson Educ. Inc.*, 133 S. Ct. 1630 (2013).  But the Court declined to do so with respect to this Court's decision in *Ninestar*, which had applied *Jazz Photo* to resolve the question of international exhaustion in the patent context.  *See Ninestar Tech. Co. v. ITC*, 133 S. Ct. 1656 (2013), *denying cert. to* 667 F.3d 1373 (Fed. Cir. 2012) (presenting the question "whether the initial authorized sale outside the United States of a patented item terminates all patent rights to that item").

"disposition of the article" that allowed the "patentee [to] receive[] his reward for the use of the article" (quoting *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942))).

The absence of a codified patent exhaustion provision reflects additional salient differences between *Kirtsaeng* and *Jazz Photo*. The patent exhaustion doctrine has none of the nuanced legislative history that the Court exhumed in *Kirtsaeng*. 133 S. Ct. at 1360–62. Conversely, the relevant provisions of the Copyright Act do not expressly address their extraterritorial reach, while the lack of extraterritorial reach of patent law is "embedded in the Patent Act itself," *see Microsoft*, 550 U.S. at 455 (citing 35 U.S.C. § 154(a)(1)); *see also* 35 U.S.C. § 271. And whereas § 109(a) creates a specific and affirmative entitlement in the *purchasers* of copyrighted works, the patent exhaustion caselaw concerns whether *patentees* have been duly compensated for their invention, *see Jazz Photo I*, 264 F.3d at 1105. Though similar policy rationales apply, nothing suggests that either doctrine is linked to or derived from the other. *Cf. Bobbs-Merrill*, 210 U.S. at 346.[15] There is no textual or doctrinal inconsistency between *Kirtsaeng* and *Jazz Photo*.

---

[15] This Court's recent decision in *LifeScan* is not to the contrary. In considering a question on which patent law supplied no clear answer — whether exhaustion applies to products distributed at no charge — this Court concluded that the Supreme Court's holdings had never limited the exhaustion doctrines to sales alone. 734 F.3d at 1374–75. It then noted that the English common law cited in

Third, the common law considerations raised in *Kirtsaeng* and quoted in Impression's brief are not implicated here.  (*See* A25.)  Lord Coke, in 1623, discussed a principle of the common law of property that barred restraints on alienation of personal property.  Because the Copyright Act long ago codified the first-sale doctrine, *Kirtsaeng* concluded that this common law continued to apply at the time of codification and thus informed the present meaning of §109(a).  *See* 133 S. Ct. at 1363 (discussing Copyright Act of 1909).  Patent law's exhaustion doctrine, by contrast, has continued to develop through judicial precedent in a way that makes older and more general pronouncements like Lord Coke's far less relevant.

Rather than looking to the Institutes of the Laws of England to determine the geographic scope of exhaustion, patent lawyers need only consult American authorities such as *Jazz Photo* and *Boesch*.  Indeed, Congress's decision not to disturb the well-established rule that the Patent Act lacks extraterritorial effect (*see supra* at 47) indicates Congress's acceptance of patent law's approach to extraterritorial exhaustion, *see, e.g., Microsoft*, 550 U.S. at 456–59 (discussing congressional response to caselaw construing the extraterritorial reach of the Patent

---

*Kirtsaeng* indicated that principles limiting restraints on alienation applied equally to sales and gifts. *Id.* at 1376. But this Court expressly noted that copyright decisions do not control this question of patent law, *id*. at 1375–76 (citing *Bobbs-Merrill*, 210 U.S. at 346).

Act).  Any inference that might be drawn in the copyright context regarding the

canon against interpreting statutes to be in derogation of the common law, *see*

*Kirtsaeng*, 133 S. Ct. at 1363, or the direct applicability of restraint-on-alienation

rules (*see* Opening Br. at 5–7), has no purchase where Congress and the courts

have already set forth distinct rules on this question.[16]

### C.    *Jazz Photo* Continues to Represent the Soundest Approach to International Exhaustion.

Impression cannot show any conflict between the Supreme Court's decision

in *Kirtsaeng* and this Court's decisions in the *Jazz Photo* line of cases.  Much less

can Impression demonstrate the "clear[] irreconcilab[ility]" required before the

binding law of the Circuit may be set aside.  (*See supra* at 21–22.)  Thus, the

district court was correct to recognize that the rule of *Jazz Photo* "should not be

---

[16] Only a few courts have addressed the argument that *Kirtsaeng* changed patent law.  In addition to the decision in this case, the U.S. District Court for the Northern District of Illinois recently adhered to the rule that a first sale abroad does not exhaust a patentee's rights in the United States.  *See Robert Bosch LLC v. Trico Prods. Corp.*, No. 12-437, 2014 WL 2118609, at *2 (N.D. Ill. May 21, 2014) (A4465–69).  A decision from the Northern District of California held that a foreign sale *did* exhaust U.S. patent rights, but rested on the fact that the foreign sale was made pursuant to an express worldwide license which included the United States.  This satisfied the concerns of the exhaustion doctrine, the court held, by ensuring the patentee was compensated for its sale and for the prospect of imports into the United States.  *See SanDisk Corp. v. Round Rock Research LLC*, No. 11-5243, 2014 WL 2700583 (N.D. Cal. June 13, 2014) (A4470–74).  The court distinguished *Jazz Photo* and *Ninestar* on this basis, a distinction that likewise applies in this case, given that Lexmark did not grant worldwide licenses.

overturned" because it was not "plainly inconsistent with the [intervening] Supreme Court precedent."  (A23 (citing *Ninestar*, *Fujifilm*, and *Static Control*).)

Yet exhaustion's territorial limitation would remain the correct rule even if this Court were free to reconsider it.  Impression states flatly that "[a]s a matter of logic," there is "no reason," to distinguish foreign and domestic sales.  (Opening Br. 3.)  Impression is wrong.  *Kirtsaeng* itself noted that extending exhaustion to foreign sales would "make it difficult, perhaps impossible" to sell at different prices in different foreign markets, according to demand and purchasing power. *See* 133 S. Ct. at 1370.  While the Supreme Court concluded that this was not of significance under the Copyright Act, *id.*, the Patent Act expressly allows for divided markets, *see* 35 U.S.C. § 261, and expressly acknowledges that patented articles lawfully acquired and owned abroad can result in infringement upon entry into the United States, *see id.* § 272 (temporary presence in the United States).  In dismissing that regime, Impression ignores the substantial incentives for innovation that flow from the ability to tailor sales to the world's many unique markets and those markets' varying degrees of patent protection.  Equally significant, this approach overlooks the substantial distributional effects that an

international exhaustion regime would have for low-income countries, whose consumers likely could not afford a single worldwide price.[17]

Nor does Impression grapple with the considerable reliance interests that have built up around the territorial patent regimes that apply in the United States and abroad.  It ventures that the current regime might pose problems for Americans buying used cars from Canada.  (Opening Br. 3.)  That concern is questionable, given, among other things, substantial customs and environmental regulation of cross-border car sales.  *See* U.S. Customs & Border Protection, *Importing a Motor Vehicle*, *available at* http://www.cbp.gov/trade/basic-import-export/importing-car (last visited Oct. 16, 2014).  Regardless, Impression utterly fails to demonstrate that, under the *Jazz Photo* regime, patents are enforced against unsuspecting American buyers (as opposed to dealers) of foreign used cars.  Indeed, auto manufacturers have every incentive to maintain a robust resale market to sustain the premium prices they can charge for new cars that are eventually resold.  *See* Guy Rub, *The Economics of* Kirtsaeng v. John Wiley & Sons, Inc., 81 Fordham L. Rev. Res Gestae 41, 48–49 (2013), *available at* http://fordhamlawreview.org/assets/res-gestae/volume/81/41_Rub.pdf.

---

[17] *See, e.g.*, Mainak Mazumdar & Dyuti S. Banerjee, *On Price Discrimination, Parallel Trade and the Availability of Patented Drugs in Developing Countries*, 32 Int'l Rev. L. & Econ. 188, 189-93 (2012) (finding "price discrimination alleviates the problem of non-availability of a patented drug compared to the uniform pricing strategy" in developing countries).

To the extent Impression tries to piggyback on the "horribles" paraded in *Kirtsaeng*, 133 S. Ct. at 1364–66, it cannot ignore the significant practical differences between patent and copyright law. Recognizing copyright protection in a written work, for example, generally restricts its use for 70 years after the author's death or 95 years after its publication, depending on when the work was created. These periods may be hard to calculate and last far longer than the 20-year term provided under patent law. The concerns of certainty and error that influenced *Kirtsaeng*, therefore, are substantially mitigated in the patent context. Moreover, incentives to innovate and divide markets take on greater importance in the patent area (where the affected products include, among other things, life-saving drugs and medical technologies) than in the field of copyright.

Even if these considerations militated in favor of an adjustment in the patent exhaustion regime, it is abundantly clear that Congress, rather than the courts, is best positioned to act. Courts are not well-suited to weigh, for *all* patented products, the tradeoff between incentives for creation and distribution, and the risk of traps for unwary purchasers of used foreign goods. Nor are judges positioned to anticipate or account for the economic fallout that would follow from ending the ability of patentees to segment markets, which could radically alter the distribution and pricing of goods all around the world. Congress has responded to such

concerns before, *see, e.g., Microsoft*, 550 U.S. at 456–59, and can do so again should a need arise.

## CONCLUSION

The Court should affirm the judgment of infringement with respect to cartridges first sold abroad, reverse the judgment of non-infringement with respect to the Return Program cartridges sold in the United States, and remand for entry of judgment in favor of Lexmark.

Dated:  October 20, 2014

Respectfully submitted,

/s/ Constantine L. Trela, Jr.

TIMOTHY C. MEECE
V. BRYAN MEDLOCK, JR.
JASON S. SHULL
AUDRA C. EIDEM HEINZE
BANNER & WITCOFF, LTD.
Ten South Wacker Drive
Chicago, IL 60606
Telephone: (312) 463-5420
Facsimile: (312) 463-5720
tmeece@bannerwitcoff.com

CONSTANTINE L. TRELA, JR.
SIDLEY AUSTIN LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7293
Facsimile: (312) 853-7036
ctrela@sidley.com

STEVEN B. LOY
STOLL KEENON OGDEN PLCC
300 W. Vine Street
Lexington, KY 40507
Telephone: (859) 231-3000

BENJAMIN J. BEATON
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8344
Facsimile: (202) 736-8711

*Counsel for Lexmark International, Inc.*

# ADDENDUM

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

LEXMARK INTERNATIONAL, INC.

    Plaintiff,

      v.

INK TECHNOLOGIES PRINTER SUPPLIES, LLC, ET AL.

    Defendants.

Civil Action No.
1:10-CV-564-MRB

### STIPULATED FINAL JUDGMENT

This matter is before the Court on Plaintiff Lexmark International, Inc.'s ("Lexmark's") and Defendant Impression Products, Inc.'s ("Impression's") Joint Motion For Entry Of Stipulated Order Regarding Supplementation Of Record, Limited Reconsideration To The Extent Necessary To Preserve Appellate Rights, For Non-Infringement With Respect To Toner Cartridges First Sold Inside The United States, For Infringement For Toner Cartridges First Sold Outside The United States, And For Entry Of Final Judgment ("Joint Motion"), and the Court having considered the Joint Motion and being otherwise sufficiently advised,

    **IT IS HEREBY FOUND, ORDERED, ADJUDGED** that:

    1.    Judgment is entered in favor of Lexmark and against Impression on Count I of Lexmark's Second Amended Complaint with respect to accused cartridges first sold outside of the United States.

    2.    Judgment is entered in favor of Impression and against Lexmark on Count I of Lexmark's Second Amended Complaint with respect to accused cartridges that are subject to the Return Program condition (*i.e.*, Return Program Cartridges) and first sold in the United States.

1

3.      This Stipulated Entry of Final Judgment resolves all questions of liability as between Lexmark and Impression and is final, ~~except for an accounting within the meaning of 28 U.S.C. § 1292(c)(2)~~.

4.      Any claims Lexmark may have against unidentified John Doe Defendants are hereby dismissed without prejudice.

5.      Subject to paragraph 3 *supra*, all claims against each of the named Defendants in this action are now resolved.

6.      This Stipulated Entry of Final Judgment is subject to any appeal that Impression or Lexmark may take based on the Court's Opinions and Orders of March 27, 2014 (ECF Nos. 615, 617), regarding whether Lexmark's United States patent rights are exhausted in (1) accused cartridges first sold outside of the United States and (2) accused cartridges that are subject to the Return Program condition (*i.e.*, Return Program cartridges) and first sold inside the United States.

7.      Lexmark and Impression make this Stipulated Entry of Final Judgment to promote judicial economy and expressly reserve all of their applicable rights (including all claims and defenses) on remand, if any.

Date: June 23, 2014

_s/ Michael R. Barrett_
United States District Judge

HAVING BEEN SEEN AND AGREED TO ON MAY 29 2014, by:

P. Douglas Barr (Ohio Bar No. 20868)
Steven B. Loy
Anthony J. Phelps
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507

Edward F. O'Connor
*ADMITTED PRO HAC VICE*
THE ECLIPSE GROUP LLP
2020 Main Street, Suite 600
Irvine, California 92614
Phone: (619) 239-4340

2

A0002

Telephone: (859) 231-3000
Facsimile: (859) 253-1093

William J. Hunter, Jr.
STOLL KEENON OGDEN PLLC
2000 PNC Plaza
500 West Jefferson Street
Louisville, KY 40202
Telephone: (502) 333-6000
Facsimile: (502) 333-6099

Timothy C. Meece
V. Bryan Medlock
Jason S. Shull
Audra Eidem Heinze
BANNER & WITCOFF LTD.
10 South Wacker Drive, Suite 3000
Chicago, Illinois 60606
Telephone: (312) 463-5000

*Attorneys for Plaintiff,*
*Lexmark International, Inc.*

Fax: (619) 239-0116
Email: efo@eclipsegrp.com

Crystal L. Maluchnik (0077875)
George H. Carr (0069372)
JANIK L.L.P.
3200 South Hill Blvd., Suite 300
Cleveland, Ohio 44147
440.838.7600
Fax: 440.838.7601
crystal.maluchnik@janiklaw.com
george.carr@janiklaw.com

3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

LEXMARK INTERNATIONAL, INC.             Civil Action No.1: 10-CV-564

         Plaintiff,                         Judge Michael R. Barrett

     v.

INK TECHNOLOGIES PRINTER SUPPLIES,
LLC, ET AL.

         Defendants.

**OPINION AND ORDER**

This matter is before the Court on Defendant Impression Products, Inc.'s Second Motion to Dismiss. (Doc. 395). Plaintiff Lexmark International, Inc. has filed a response in opposition (Doc. 431), and Defendant Impression Products, Inc. has filed a reply (Doc. 434). Plaintiff Lexmark International, Inc. also has filed a surreply (Doc. 440-1), and Defendant Impression Products, Inc. has filed a response to the surreply (Doc. 450).[1] This matter is now ripe for review.

**I.    BACKGROUND**

This case concerns the alleged infringement of Plaintiff Lexmark International, Inc.'s ("Lexmark") patented toner cartridges. Lexmark contends that the infringement includes cartridges offered under its Return Program, although the allegations in the Second Amended Complaint do not specifically identify the Return Program cartridges as being at issue.

In its opposition brief, Lexmark claims that it offers customers two options when purchasing a cartridge: (1) a cartridge subject to a combination single-use patent and contract license (a "Return Program cartridge," previously referred to as a "Prebate cartridge"), or (2) a

---

[1] The Court previously granted the motion for leave to file a surreply, deeming the surreply and the opposition filed. (*See* Doc. 440-1; Doc. 450).

1

**A0004**

regular cartridge without any restrictions on its use. According to Lexmark, the purchasers of the Return Program cartridge receive an up-front discount on the purchase price of the cartridge in exchange for agreeing to use the cartridge only once, and to return the empty cartridge to Lexmark for remanufacturing or recycling.

Instead of focusing on the lack of specific allegations in the Second Amended Complaint, Defendant Impression Products, Inc. ("Impression Products") seeks dismissal of the claims on the basis that the Return Program is invalid under patent law.

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). "[T]o survive a motion to dismiss[,] a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 1974, 167 L. Ed. 2d 929 (2007)). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).

## III.    PARTIES' ARGUMENTS

Impression Products contends that the Return Program is invalid under patent law. In support, it relies upon *Static Control Components, Inc. v. Lexmark International, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. Mar. 31, 2009) ("*Static Control II*"), where the Eastern District of Kentucky reversed its prior decision, holding that the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008), now required it to find that Lexmark's Return Program (then known as the Prebate Program) is invalid. Impression Products contends that the Court should follow that decision.

In response, Lexmark contends that *Static Control II* was erroneously decided because *Quanta*, 553 U.S. 617, did not determine that all post-sale restrictions were invalid. Lexmark contends that its single-use licenses granted to consumers under the Return Program are enforceable, relying on multiple cases including *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed. Cir. 1992).

In its reply, Impression Products argues that Lexmark is attempting to enforce a single-use restriction intended solely for the purpose of preventing competition, and it does not indicate that the consuming public is ever made aware of the fact that purchasing products are subject to a single-use restriction. *Static Control II* is the only decision post-*Quanta* to consider the validity of the Return Program, and in that case, the district court found the Return Program invalid. Impression Products claims that all of the cases relied upon by Lexmark are distinguishable and do not make the Return Program valid and enforceable.

Lexmark argues in its surreply that Impression Products concedes that *Mallinckrodt*, 976 F.2d 700, controls in regards to use-based restrictions, that there is no Federal Circuit precedent indicating *Mallinckrodt* was overruled, that Impression Products improperly relies on matters

outside the pleadings, and that Impression Products improperly speculates as to the reasons Lexmark implemented its Return Program.

Impression Products argues in its opposition to the surreply that *Mallinckrodt*, 976 F.2d 700, does not stand for the proposition that any and all post-sale restrictions are legal and enforceable. It argues that Lexmark's Return Program is plainly implemented for improper purposes.

## IV.    ANALYSIS

The issue presented is whether the Return Program is invalid as a matter of law. Having considered the relevant caselaw and the briefings of the parties, the Court finds that Lexmark's patent infringement claims are barred as a matter of law by the doctrine of patent exhaustion and must be dismissed.

The issue of patent exhaustion in regards to conditional sales and licenses is not a new one. Courts have been grappling with the issue since as the mid-19th Century when the Supreme Court rendered its decision on patent exhaustion in *Bloomer v. McQuewan*, 55 U.S. 539, 549, 14 L. Ed. 532 (1853). The question before the Supreme Court was whether purchasers of licenses to sell or use the planning machines for the duration of the original patent term could continue to use the licenses through the extended term. *Id.* at 548. The Supreme Court held that the extension of the patent term did not affect the rights already secured by purchasers who bought the item for use "in the ordinary pursuits of life." *Id.* at 549; *see also Quanta*, 553 U.S. at 625. In reaching that decision, the Supreme Court recognized the distinction between purchasers of the right to manufacture and sell patents articles and end users of those articles. It explained:

> The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is that he obtains by the patent. And when he sells the exclusive privilege of making or vending it for use in a particular place, the purchaser buys a portion of the franchise which the

4

patent confers. He obtains a share in the monopoly, and that monopoly is derived from, and exercised under, the protection of the United States. And the interest he acquires, necessarily terminates at the time limited for its continuance by the law which created it. The patentee cannot sell it for a longer time. And the purchaser buys with reference to that period; the time for which exclusive privilege is to endure being one of the chief elements of its value. He therefore has no just claim to share in a further monopoly subsequently acquired by the patentee. He does not purchase or pay for it.

But the purchaser of the implement or machine for the purpose of using it in the ordinary pursuits of life, stands on different ground. In using it, he exercises no rights created by the act of Congress, nor does he derive title to it by virtue of the franchise or exclusive privilege granted to the patentee. The inventor might lawfully sell it to him, whether he had a patent or not, if no other patentee stood in his way. And when the machine passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of Congress. And if his right to the implement or machine is infringed, he must seek redress in the courts of the State, according to the laws of the State and not in the courts of the United States, nor under the law of Congress granting the patent. The implement or machine becomes his private, individual property, not protected by the laws of the United States, but by the laws of the State in which it is situated.

*McQuewan*, 55 U.S. at 549-50.

Numerous decisions concerning patent exhaustion in relation to sales and licenses have followed *McQuewan*. Rather than revisiting every one of those relevant opinions here, the Court briefly summarizes only the most relevant of the cases relied upon by the parties in their briefings.

The first post-*McQuewan* case to consider is *General Talking Pictures Corporation v. Western Electric Company*, 304 U.S. 175, 58 S. Ct. 849, 82 L. Ed. 1273 (1938). In that case, a patent owner licensed another company the right to manufacture and sell patented sound amplifiers only for private, non-commercial use. *Id.* The licensee, however, knowingly sold the amplifiers to a commercial user, who also was aware that the sale was outside the scope of the license. *Id.* at 180. The Supreme Court explained that patentees may restrict their licensees to certain uses of licensed technology as long as the restrictions do not "extend the scope of the

5

monopoly." *Id.* at 181. Given that the licensee sold the patented product in violations of the field-of-use restriction, the sale was unauthorized and did not result in patent exhaustion. *Id.* Both the licensee and the purchasers were thus found to be bound by the restriction. *Id.* at 180-81.

Although multiple cases followed *General Talking Pictures*, the Court moves forward in time to the decision in *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 701 (Fed. Cir. 1992), which is central to the parties' dispute. There, the Federal Circuit held that a "single use only" restriction, which accompanied the first sale of a device from the patent owner directly to hospitals and that required disposal of the device after the first use, was a valid and enforceable license. *Id.* It reasoned that generally, "any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the [patented] article, will be upheld by the courts." *Id.* at 703. In reaching that decision, the circuit court considered multiple prior cases. *Id.* at 704-07. Based upon the totality of those cases, the circuit court determined the fact that "a restrictive license is legal seems clear." *Id.* at 704 (citing *Mitchell v. Hawley*, 83 U.S. 544, 21 L. Ed. 322). "[T]he patentee may grant a license upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure." *Id.* at 704-05 (internal quotations omitted). "Unless the condition violates some other law or policy (in the patent field, notably the misuse or antitrust law), private parties retain the freedom to contract concerning conditions of sale." *Id.* at 708 (internal citation omitted). Thus, according to the Federal Circuit, if the restriction is found to "be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims, that ends the inquiry." *Id.* at 708. If the inquiry leads "to the conclusion that there are anticompetitive effects extending beyond the

6

patentee's statutory right to exclude, these effects do not automatically impeach the restriction" as anti-competitive effects that are not *per se* violations of law "are reviewed in accordance with the rule of reason." *Id.*[2]

The Ninth Circuit's decision in *Arizona Cartridge Remanufacturers Association Inc. v. Lexmark International, Inc.*, 421 F.3d 981 (9th Cir. 2005) that followed *Mallinckrodt* specifically concerned Lexmark's Prebate Program. In that case, the circuit court considered whether Lexmark's advertising of its Prebate Program under which it gave purchasers an up-front discount in exchange for an agreement to return the empty cartridge to Lexmark for remanufacturing mislead customers into thinking the post-sale restriction was enforceable. *Id.* The plaintiff did not challenge the district court's holding that Lexmark's patent rights were not exhausted because it "could condition the use of its patented Prebate cartridges by consumers under the principle articulated by the Federal Circuit in *Mallinckrodt, Inc. v. Medipart, Inc.*, which held that a restriction on a patented good is permissible as long as it is 'found to be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims.'" *Arizona Cartridge*, 421 F.3d at 986 (quoting *Mallinckrodt*, 976 F.2d at 708). Nor did it argue that Lexmark acted beyond the scope of its patent. *Id.* Instead, it challenged whether Lexmark had a valid contract with the consumers of its product. *Id.* at 987. The circuit court determined that Lexmark presented sufficient unrebutted evidence that it had a facially valid contract because the language on the outside of the cartridge package specified the terms under which the consumer could purchase the item, which the consumer could read prior to

---

[2] This is the concept of patent misuse. The *Mallinckrodt* court noted that the defense requires a factual determination as to whether the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market. 976 F.2d at 706 (citing *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995 (Fed. Cir.), *cert. denied*, 477 U.S. 905, 106 S. Ct. 3275, 91 L. Ed. 2d 565 (1986)).

determining whether to purchase the product.  *Id.*  It distinguished that case from instances in which the consumer did not have notice of the condition at the time of purchase.  *Id.* at 987 n. 6.

The Lexmark Prebate Program next was addressed in *Static Control Components, Inc. v. Lexmark International, Inc.*, 487 F. Supp. 2d 830, 846-48 (E.D. Ky. 2007) ("*Static Control I*"), where the district court held that Lexmark's Prebate Program survived summary judgment due to the valid restrictive licenses contained on the packaging of the prebate cartridges.   In so holding, it rejected the notion that the sale of the cartridges to the middlemen before the end user who is bound by the Prebate Program agreement constituted an unrestricted sale that exhausted the patent rights of Lexmark.  *Id.* at 847.  The district court relied, in part, on the Federal Circuit's guidance in *Mallinckrodt* that the legality of restrictive licenses "seems clear."  *Id.* at 848-49 (citing *Mallinckrodt*, 976 F.2d at 704).

Following *Static Control I*, the Supreme Court granted certiorari in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008), to consider whether the license agreement for computer technology patents of LG Electronics precluded exhaustion of the patent rights of LG Electronics.  LG Electronics had prevailed before the Federal Circuit on the basis that the agreement between LG Electronics and Intel imposed express conditions on the licensed products, that Quanta had express notice that Intel's sales were conditional, and that the conditions survived exhaustion under *Mallinckrodt*.  *See LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1370-71 (Fed. Cir. 2006).  The Supreme Court, however, did not expressly reference *Mallinckrodt* in its decision, holding that the License Agreement and Master Agreement between LGE and Intel were dispositive.  *Quanta*, 553 U.S. 636-38.  It reasoned that the License Agreement and the Master Agreement were independent instruments, and the requirement that Intel notify its customers of use restrictions appeared only in the Master

**A0011**

Agreement.  *Id.* at 636.  That restriction thus did not affect Intel's rights under the License Agreement, which imposed no conditions on Intel's ability to sell to consumers.  *Id.* at 636-37. As such, the Supreme Court determined that the agreements broadly authorized Intel to sell the licensed products without restrictions or conditions such that the patent rights were exhausted, even though Quanta was aware of the condition.  *Id.* at 637-38.  In so holding, the Supreme Court stated:  "The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article."  *Id.* at 638.

After *Quanta*, the *Static Control I* decision was reconsidered by the district court.  In *Static Control II,* 615 F. Supp. 2d at 582, the district court held that *Quanta* represented a change in the law of patent exhaustion that broadened the understanding of patent exhaustion, and whereby a patent-based use restriction through post-sale prebate terms was invalidated.  In reaching its decision, the district court considered *Quanta* as well as numerous other Supreme Court cases concerning patent exhaustion.  *Id.* at 578-84.  Upon consideration, the district court believed that the caselaw "reveals that the Court has consistently held that patent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products" and that after "the first authorized sale to a purchaser who buys for use in the ordinary pursuits in life, a patent holder's patent rights have been exhausted."  *Id.* at 582.  Applying those concepts to the Prebate Program, the district court determined that Lexmark "attempts to reserve patent rights in its products through post-sale restrictions on use imposed on its customers[,]" which is "what *Quanta* says Lexmark cannot do."  *Id.* at 584.  The district court noted a distinction between a condition on the right to sell, as was at issue in *Quanta*, and a post-sale condition on use, like the Prebate Program, stating that the sales of Lexmark cartridges exhausted Lexmark's patent rights

9

and stripped its ability to control post-sale use of the cartridges through patent law. *Id.* at 585. Based upon that analysis, the district court noted its belief that *Quanta* overruled *Mallinckrodt* sub silentio. *Id.* On appeal, however, the Sixth Circuit declined to decide the validity of the Prebate Program, noting that the question was extremely complex and unsettled, and that its resolution would not be relevant to the outcome of the appeal. *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 421 (6th Cir. 2012).

In *Princo Corporation v. International Trade Commission*, 616 F.3d 1318 (Fed. Cir. 2010), *cert. denied*, 2011 U.S. LEXIS 3703 (May 16, 2011), the Federal Circuit considered the doctrine of patent misuse in the context package licenses containing field-of-use restrictions for recordable compact discs and rewritable compact discs. Philips and Sony offered patent licenses to make the CD-R or CD-RW discs with a field-of-use restriction that limited the licensees to using the licensed patents to produce discs according to the Orange Book standards. *Id.* at 1322. Explaining that patent misuse in the licensing context is a doctrine that limits a patentee's right to impose conditions on a licensee that exceed the scope of the patent, the circuit court determined that it did not bar the intervenor from enforcing patent rights against Princo. *Id.* at 1322, 1328. In reaching its decision, the circuit court relied upon *B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419 (Fed. Cir. 1997) and *Mallinckrodt*, 976 F.2d 700, in explaining the rationale underlying the doctrine:

> As a general matter, the unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter, on the theory that the patentee has bargained for, and received, the full value of the goods. That "exhaustion" doctrine *does not apply, however, to a conditional sale or license*, where it is more reasonable to infer that a negotiated price reflects only the value of the "use" rights conferred by the patentee. Thus, express conditions accompanying the sale or license of a patented product, such as field of use limitations, are generally upheld. . . . . When those contractual conditions violate public policy, however, as in the case of price-fixing conditions and tying restraints, the underlying patents

10

become unenforceable, and the patentee loses its right to sue for infringement or breach of contract.

*Princo*, 616 F.3d at 1328. The circuit court further recognized that the scope of the patent misuse doctrine is narrow because "the patent grant entitles the patentee to impose a broad range of conditions in licensing the right to practice the patent[.]" *Id.* at 1329.[3]

Here, the Court is persuaded to follow the reasoning of the district court in *Static Control II*. Consistent with the *Static Control II* court's analysis, this Court's review of the relevant caselaw does not reflect an endorsement by the Supreme Court of post-sale use restrictions once goods are placed into the ordinary stream of commerce. *See Static Control II*, 615 F. Supp. 2d at 578-83 (explaining relevant caselaw). Further, the Court cannot square the *Quanta* decision with the facts alleged by Lexmark as to its Return Program. In *Quanta*, the consumers had notice of the conditions of the sale, yet the Supreme Court still held that the patent rights of LG Electronics had been exhausted after the first unrestricted authorized sale by its licensee Intel. Those facts parallel this case. Lexmark does not allege that the authority of the sellers of the Return Program cartridges were restricted or conditioned in any way. In other words, the facts alleged by Lexmark do not suggest that the sellers had anything other than full authority to sell the Return Cartridges that practiced Lexmark's patents. Instead, Lexmark alleges only that the Return Program cartridges contained notices of a license restriction which bound the ultimate purchaser. Under *Quanta*, those post-sale use restrictions do not prevent patent rights from being exhausted given that the initial sales were authorized and unrestricted. Thus, to the extent that

---

[3] Although Lexmark also cites to *Monsanto Company v. Bowman*, 657 F.3d 1341, 1347 (Fed. Cir. 2011) and *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1371-72 (Fed. Cir. 2010), those cases are not helpful to the analysis of this issue. *Monsanto* cited *Mallinckrodt* only when explaining the Federal Circuit's reasoning in two cases decided pre-*Quanta*. *Monsanto*, 657 F.3d at 1347. Its decision, however, did not endorse those principles, holding that even if the patents had been exhausted as to the first generation self-replicating seeds, no authorized sale had occurred to exhaust the right in the second generation seeds. *Id.* As for *Fujifilm*, it considered *Quanta* in regards to the territorial requirement for patent exhaustion, which is not the issue presently before the Court. *Fujifilm*, 605 F.3d at 1371-72.

*Mallinckrodt* holds that such post-sale use restrictions preclude patent exhaustion after an authorized sale, the Court agrees with the *Static Control II* court that *Mallinckrodt* was overruled by *Quanta* sub silentio. *See Ninestar Tech. Co. v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012) (suggesting that an appellate court decision should not be found overturned by new Supreme Court precedent unless it is plainly inconsistent with that precedent); *Fujifilm Corp. v. Benum*, 605 F.3d 1366, 1371 (Fed. Cir. 2010) (similar to *Ninestar*); *Static Control II*, 615 F. Supp. 2d 575 (E.D. Ky. 2009) (similar to *Ninestar*). Although the Court recognizes that *Princo* cited to *Mallinckrodt* with approval in considering the doctrine of patent misuse, that case concerned license restrictions that limited the use of the patent to manufacture and produce the product in accordance with certain standards. It did not concern products that had been placed into the stream of commerce for use in ordinary pursuits in life. *Princo*'s reliance on *Mallinckrodt* thus does not demonstrate a continued endorsement of it in regards to the type of post-sale use restrictions at issue in this case.

A contrary holding would not only be inconsistent with *Quanta*, but would also create significant uncertainty for downstream purchasers and end users who may continue to liable for infringement even after an authorized sale to the consumer has occurred. Therefore, the Court is persuaded that the fully authorized sales of the Return Program cartridges to consumers for use in the ordinary pursuits in life took the cartridges outside the scope of the patent monopoly despite the notices contained on those cartridges, and Lexmark may not now rely on patent law to hold Impression Products liable for infringement.

## V.    CONCLUSION

For the foregoing reasons, Impression Products' Second Motion to Dismiss (Doc. 395) is **GRANTED**. The infringement claims against Impression Products based upon the Return Program cartridges are hereby **DISMISSED**.

12

**IT IS SO ORDERED**.

                                                s/Michael R. Barrett
                                                Michael R. Barrett, Judge
                                                United States District Court

13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LEXMARK INTERNATIONAL, INC.    CASE NO.: 1:10-cv-564

   Plaintiff,        Judge Michael R. Barrett

  v.

INK TECHNOLOGIES PRINTER SUPPLIES,
LLC, et al.,

   Defendants.

## OPINION AND ORDER

This matter is before the Court on the Motion to Dismiss of Defendant Impression Products, Inc. (Doc. 335). Plaintiff Lexmark International, Inc. has filed a response in opposition (Doc. 367) and Defendant Impression Products, Inc. has filed a reply (Doc. 368).[1] Defendant Impression Products, Inc. subsequently filed a Notice of Additional Authority (Doc. 485) to which Plaintiff Lexmark International, Inc. filed a response (Doc. 488). Defendant Impression Products, Inc. then filed a reply in support of its notice of additional authority. (Doc. 491). This matter is now ripe for review.

## I.  BACKGROUND

This case concerns the alleged infringement of Plaintiff Lexmark International, Inc.'s ("Lexmark") patented toner cartridges. Lexmark alleges that it first sold the patented inkjet cartridges at issue outside of the United States. It claims that those patented inkjet cartridges were acquired and remanufactured by one or more foreign defendants that then sold the remanufactured inkjet cartridges to other defendants. Those defendants, in turn, sold the

---

[1] Plaintiff Lexmark International, Inc. subsequently filed a motion for leave to file a surreply (Doc. 378), which Defendant Impression Products, Inc. opposed (Doc. 379). That motion for leave has been denied.

remanufactured inkjet cartridges to others, including customers in the United States.  Lexmark contends that Defendant Impression Products, Inc. ("Impression Products") was one of those defendants that sold in the United States remanufactured inkjet cartridges that had originally been sold outside of the United States thereby infringing Lexmark's patent.

## II.    LEGAL STANDARD

In reviewing a motion to dismiss for failure to state a claim, this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). "[T]o survive a motion to dismiss[,] a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 1974, 167 L. Ed. 2d 929 (2007)).  A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed. 2d 209 (1986); *see also In re Sofamor Danek Grp.,* 123 F.3d 394, 400 (6th Cir. 1997) (stating that a court "'need not accept as

2

**A0018**

true legal conclusions or unwarranted factual inferences'") (quoting *Morgan v. Church's Fried Chicken*, 829 F.3d 10, 12 (6th Cir. 1987)).

## III. ANALYSIS

The patent exhaustion doctrine generally provides that once a patentee has made an unrestricted sale of a patented article, the patentee loses its right to control the sale, offer for sale, or use of the article. *Bowman v. Monsanto Co.*, __ U.S. __, 133 S. Ct. 1761, 1764, 185 L. Ed. 2d 931 (2013); *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008). According to a 2001 decision of the Federal Circuit, the patent exhaustion doctrine is territorial. *Jazz Photo Corporation v. International Trade Commission*, 264 F.3d 1094, 1105 (Fed. Cir. 2001). That means that in order for patent exhaustion to apply, the authorized first sale must have occurred in the United States. *Id.* ("United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent."). The *Jazz Photo* decision relies upon a United States Supreme Court decision from 1890 in which the Court held that an authorized sale of a good patented by another under the laws of a foreign country does not exhaust the patent rights of the United States patentee, and the United States patentee may sue for infringement when that good is imported into the United States for sale. *Id.* (citing *Boesch v. Graff*, 133 U.S. 697, 701-03, 10 S. Ct. 378, 33 L. Ed. 787 (1890)). Thus, under *Jazz Photo*, an initial authorized sale of a patented product outside of the United States would not exhaust the patent rights of the patent holder. *See id.*

Recently, the Supreme Court addressed the parallel "first sale" doctrine under copyright law. *Kirtsaeng v. John Wiley & Sons, Inc.*, __ U.S. __, 133 S. Ct. 1351, 1354, 185 L. Ed. 2d 392 (2012). The Supreme Court's decision was rooted in interpretation of a statutory provision of

3

copyright law. *Id.* at 1357-71. Specifically, the Supreme Court considered whether the phrase "lawfully made under this title" restricts the scope of the first sale doctrine geographically. *Id.* at 1357 (citing 17 U.S.C. 109(a)). The plaintiff contended that "lawfully made under this title" imposed a geographical limitation that prevented the first sale provision from applying to its books first manufactured and sold overseas. *Id.* at 1357-58. The defendant, however, read the phrase as imposing a non-geographical limitation that required only that the book be made in compliance with the Copyright Act such that a first manufacture and sale abroad would extinguish the rights of the copyright owner. *Id.* at 1358. The Supreme Court determined that the plain language of the provision said nothing about geography and that interpreting the provision not to provide a geographical limitation made linguistic sense and did not present the same difficulties as an interpretation that included a geographical limitation. *Id.* at 1358-71.

However, the Supreme Court's analysis did not end there. It next considered the context of the statutory provision. *Kirtsaeng*, 133 S. Ct. at 1360. According to the Supreme Court, the legislative history of the statutory provision indicates that Congress did not have geography in mind when writing the present version of section 109(a). *Id.* Additionally, it determined that other provisions of the current statute supported a non-geographical interpretation. *Id.* at 1361-62. For example, the "manufacturing clause," which limited importation of many copies printed outside the United States, was phased out in an effort to equalize treatment of copies made in America and copies made abroad. *Id.* The Supreme Court had difficulty squaring that "equal treatment" principle with a first sale doctrine that imposed geographical limitations. *Id.* at 1362.

The Supreme Court also considered whether canons of statutory interpretation favored a geographical limitation. In particular, it considered the common law history of the first sale doctrine by applying the cannon of statutory interpretation that "[w]hen a statute covers an issue

previously governed by the common law," it is presumed that "Congress intended to retain the substance of the common law." *Kirtsaeng*, 133 S. Ct. at 1363 (citing *Samantar v. Yousuf*, 560 U.S. 305, n. 13, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010)). Applying that canon, the Supreme Court traced the doctrine back to the Seventeenth Century where Lord Coke explained the common law's refusal to permit restraints on the alienation of chattels. *Id.* The Supreme Court noted that a law permitting a copyright holder to control the resale or other disposition of a chattel once sold is "'against Trade and Traffi[c], and bargaining and contracting." *Id.* (quoting L. E. Coke, Institutes of the Laws of England, § 360, p. 223 (1628)). It further recognized the same principle of freedom to resell can work to the advantage of the consumer and frees the courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods, and avoids selective enforcement inherent in any such effort. *Id.* (citing *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S 877, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007)). Accordingly, the Supreme Court determined that common law of the first sale doctrine "makes no geographical distinctions." *Id.*

The Supreme Court then considered the practical difficulties of placing geographical limitations on the first sale doctrine. *Kirtsaeng*, 133 S. Ct. at 1364. The libraries, in particular, would have difficulty maintaining their collections of foreign books that do not contain a copyright holder's present address or in negotiating fees for those copyrights after first sale. *Id.* at 1365-66. Other manufacturers and retailers of goods would face similar restrictions. *Id.* at 1365. A geographical limitation would prevent the resale of a car without the permission of the holder of each copyright on each piece of copyrighted automobile software, and it also would prevent retailers from buying and selling goods packaged abroad that contain copyrighted logos, labels, and instructions. *Id.* Similarly, museums would have to obtain the permission of a

5

copyright owner to display a foreign work, even if the copyright owner already sold or donated the work to a foreign museum. *Id.* Also of some importance was that many had relied on the first sale doctrine's protection in their businesses due to the unsettled nature of the doctrine. *Id.* at 1366.

Finally, the Supreme Court considered the defendant's arguments that a geographical interpretation was favored. *Kirtsaeng*, 133 S. Ct. at 1367-71. One particular issue addressed was the division of markets. *Id.* at 1370. The Supreme Court determined that there was "no basic principle of copyright law that suggests that publishers are especially entitled to such rights." *Id.* at 1370. Rather, "Congress enacted a copyright law that (through the 'first sale' doctrine) limits copyright holders' ability to divide domestic markets." *Id.* at 1371. That limitation is consistent with antitrust laws. *Id.* In the Supreme Court's view, "[w]hether copyright owners should, or should not, have more than ordinary commercial power to divide international markets is a matter for Congress to decide . . . [and the Supreme Court does] no more here than try to determine what decision Congress has taken." *Id.*

Based on the entirety of its analysis, the Supreme Court held that "[i]n our view, § 109(a)'s language, its context, and the common-law history of the first sale doctrine, *taken together*, favor a non-geographical interpretation. We also doubt that Congress would have intended to create the practical copyright-related harms with which a geographical interpretation would threaten ordinary scholarly, artistic, commercial and consumer activities." *Id.* at 1358 (emphasis added).

Here, the core dispute between Lexmark and Impression Products is whether the United States Supreme Court's March 19, 2013 decision in *Kirtsaeng*, 133 S. Ct. 1351, overturns the Federal Circuit's decision in *Jazz Photo*, 264 F.3d 1094, such that Lexmark's patent rights were

exhausted upon the first authorized sale abroad.[2]  Other courts that have considered the continuing validity of an appellate court decision in light of new Supreme Court precedent have suggested that an appellate court decision should not be overturned unless it is plainly inconsistent with the Supreme Court precedent.  *See Ninestar Tech. Co.  v. Int'l Trade Comm'n*, 667 F.3d 1373, 1378 (Fed. Cir. 2012); *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1371 (Fed. Cir. 2010); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575 (E.D. Ky. 2009).

In this instance, the balance of considerations weighs in favor of finding that *Kirtsaeng* is not plainly inconsistent with *Jazz Photo*.  An obvious distinction between the two cases is that *Jazz Photo* involved patent law whereas *Kirtsaeng* involved only copyright law.  Indeed, nowhere in *Kirtsaeng* is there any express mention or consideration of patents, the patent exhaustion doctrine, or patent exhaustion's territoriality requirement.  Although a lack of express mention or consideration of the patent exhaustion doctrine does not automatically preclude application of *Kirtsaeng* to patent law, the Federal Circuit recently has reinforced that copyright cases are not "controlling" regarding patent issues.  *Lifescan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361, 2013 U.S. App. LEXIS 22332, at *38 (Fed. Cir. Nov. 4, 2013) (citing *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 346, 28 S. Ct. 722, 52 L. Ed. 1086 (1908)).  In fact, the Supreme Court historically has been reluctant to readily consider copyright cases and patent cases interchangeably, noting that the protections afforded by copyright law and patent law are different.  *See Bobbs-Merrill*, 210 U.S. at 346.[3]  Moreover, the Federal Circuit has acknowledged

---

[2] In the context of patents, courts have used the term "patent exhaustion" interchangeably with "first sale." For clarity purposes, the Court primarily will refer to "first sale" in the context of copyrights and to "exhaustion" in the context of patents, except where otherwise necessary or appropriate.

[3] In *Bobbs-Merrill*, the Supreme Court was reluctant to accept patent law cases on first sale as being directly binding for copyright law. 210 U.S. at 345-46.  There, the copyright owner relied on prior patent cases as supporting a right to impose conditions on sale.  *Id.* at 342.  The Supreme Court recognized that there were

7

that the patent exhaustion doctrine does not squarely align with first sale provision of the Copyright Act, even though they are similar doctrines. *Fuji Photo Film Co., Ltd. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1294 (Fed. Cir. 2007) (acknowledging that patent rights are exhausted through a first sale <u>in the United States</u> whereas "[a] different rule applies in the copyright context"). In that respect, the law weighs against finding that *Kirtsaeng* overturned *Jazz Photo* sub silentio.

Other factors also weigh against a finding that *Kirtsaeng* overturned *Jazz Photo*. The decision in *Kirtsaeng* is rooted in statutory and legislative interpretation of section 109(a) of the Copyright Act. 17 U.S.C. § 109(a). Noticeably absent from patent law is a codification of the exhaustion doctrine. Rather, the patent exhaustion doctrine, including its territoriality requirement, is grounded in judicial precedent. *See Jazz Photo*, 264 F.3d at 1105. As such, unlike in *Kirtsaeng*, there is no statutory provision or legislative history of the exhaustion doctrine that favors a non-geographical interpretation. Thus, the core statutory text that weighed in favor of a non-geographical interpretation is non-existent in the context of patent law.

The lack of a codified patent exhaustion doctrine means that there may be more leeway for understanding and interpreting the doctrine. While Lord Coke's policy provides a natural starting place since that policy undergirds the patent exhaustion doctrine, it is not the only factor to be considered. *See Lifescan Scotland,* 2013 U.S. App. LEXIS 22332, at *39-40 (recognizing that the same policy underlying the first sale doctrine also undergirds the doctrine of patent exhaustion) (citing *Straus v. Victor Talking Mach. Co.*, 243 U.S. 490, 500-01, 37 S. Ct. 412, 61 L. Ed. 866 (1917)). Importantly, the patent exhaustion doctrine's history differs from the history

---

differences in the extent of protections granted by copyright law and patent law. *Id.* at 346. As such, *Bobbs* teaches that the common law on patent exhaustion does not automatically transfer to copyright law. The contrary presumably also is true – that is, that law on copyright's first sale doctrine does not automatically transfer to patent law's exhaustion doctrine.

of the first sale doctrine addressed in *Kirtsaeng*. In *Kirtsaeng,* the Supreme Court considered what common law of the first sale doctrine existed prior to the codification of the doctrine in the Copyright Act of 1909, which subsequently was superseded by the Copyright Act of 1976. *Kirtsaeng*, 133 S. Ct. at 1363. In doing so, it looked to the last Supreme Court decision prior to the 1909 codification to determine if it indicated any intent to impose a geographical restriction. *Id.* at 1353. Finding no geographical restriction in that Supreme Court precedent, the Supreme Court concluded that the common law principles set forth by Lord Coke still were followed at the time of codification and had never been modified by Congress. *Id.* at 1363. Since the doctrine of patent exhaustion is not codified, the same reasons for considering and applying Lord Coke's principles are not present.

In contrast to the first sale doctrine, the patent exhaustion doctrine has evolved through Supreme Court and lower court decisions, and it remains premised upon those decisions. In particular, *Jazz Photo*, 264 F.3d 1094, is a decision that interprets the prior Supreme Court precedent on patent exhaustion to determine how it applies in the context of first sales abroad. The Supreme Court in *Kirtsaeng* did not specifically consider the evolution of a common law principle through Supreme Court decisions on patent exhaustion and the subsequent interpretations thereof. It also did not foreclose the possibility that the first sale principles articulated by Lord Coke could be and were modified by the Supreme Court and lower courts in the patent context. *See Kirtsaeng*, 133 S. Ct. at 1353 (considering whether a geographical distinction could be found in the Supreme Court case that first applied the first sale provision one year prior to its codification).

Moreover, *Kirtsaeng* suggests that Lord Coke's principles should not be applied in a vacuum. Rather, it is necessary to consider the context, history and practical considerations to

9

determine the proper application of the patent exhaustion doctrine to first sales abroad. *See Kirtsaeng*, 133 S. Ct. at 1358. Part of that context and history is *Jazz Photo* and its progeny, the Supreme Court precedent on which *Jazz Photo* relies, other judicial decisions concerning the patent exhaustion doctrine, and the practical patent-specific implications of a territoriality requirement for patent exhaustion. Those particular considerations were not addressed in *Kirtsaeng* nor were they thoroughly explained or analyzed by Impression Products.

While the Federal Circuit's recent decision in *Lifescan*, 2013 U.S. App. LEXIS 22332, may provide guidance as to how the Federal Circuit may apply *Kirtsaeng* upon reconsideration of *Jazz Photo*, it does not conclusively demonstrate that *Jazz Photo* is no longer good law. *Lifescan* did not concern the territoriality requirement of patent exhaustion. *See Lifescan*, 2013 U.S. App. LEXIS 22332. Instead, it raised a matter of first impression for the Federal Circuit – whether patent exhaustion applied to a product distributed for free. *Id.* at *33. Since there was no Supreme Court guidance directly on point, the Federal Circuit looked to prior Supreme Court precedent on the patent exhaustion doctrine in reaching its decision. *Id.* at *32-38 (citing *Bowman v. Monsanto Co.*, __ U.S. __, 133 S. Ct. 1761, 1766, 185 L. Ed. 2d 931 (2013); *United States v. Univis Lens Co.*, 316 U.S. 241, 62 S. Ct. 1088, 86 L. Ed. 1408 (1942); *Adams v. Burke*, 84 U.S. (17 Wall.) 453, 21 L. Ed. 700 (1873); *Bloomer v. McQuewan*, 55 U.S. (14 How.) 539, 14 L. Ed. 532 (1852)). After determining that the Supreme Court had never limited the patent exhaustion doctrine to sales only, it then looked to the holding in *Kirtsaeng* merely to <u>reinforce</u> its conclusion that the doctrine was not so limited, even though *Kirtsaeng* was not controlling on issues of patent law. *Id.* at *38. In particular, the Federal Circuit recognized that Lord Coke's principles undergird the patent exhaustion doctrine and do not draw any distinction between gifts and sales. *Id.* at *39-40. Therefore, considering the totality of the circumstances, the Federal

10

Circuit determined a patentee cannot "circumvent the application of patent exhaustion principles by distributing a product embodying a patent for free."  *Id.* at \*42.

Here, in contrast to *Lifescan*, the Federal Circuit has determined in *Jazz Photo* that Supreme Court precedent supports a territoriality requirement for patent exhaustion.  Thus, Lord Coke's principles are not as easily relied upon as they are in regards to the matter before the Federal Circuit in *Lifescan*.  While it is possible that upon revisiting *Jazz Photo* and its cursory reasoning, the Federal Circuit will now give more weight to Lord Coke's policy and the reasoning set forth in *Kirtsaeng*, it is not a foregone conclusion that the policy or the reasoning will be strictly applied.  This Court adheres to the view that copyright law and patent law are not identical and offer different protections.  Thus, it would be amiss to overlook the distinctions by adopting Impression Products' position that Lord Coke's principles, as applied to the Copyright Act's first sale provision, conclusively demonstrate that *Kirtsaeng* overrules *Jazz Photo* sub silentio.

Reinforcing this Court's reluctance to apply *Kirtsaeng* to patent law is the Supreme Court's denial of certiorari in a case that raised the precise issue currently before this Court. *Ninestar Technology Co., Ltd. v. International Trade Commission*, 667 F.3d 1373 (Fed. Cir. 2012), *cert. denied*, 2013 U.S. LEXIS 2409 (U.S., Mar. 25, 2013).[4]  That denial of certiorari was issued on the same day the Supreme Court remanded two others copyright cases to be considered in light of its decision in *Kirtsaeng*.  *See Kumar v. Pearson Educ., Inc.*, __ U.S. __, 133 S. Ct. 1631, 185 L. Ed. 2d 614 (2013); *Liu v. Pearson Educ. Inc.*, __ U.S. __, 133 S. Ct. 1630, 185 L.

---

[4] The Federal Circuit had relied upon *Jazz Photo* in holding that United States patent rights are not exhausted by products of foreign provenance.  *Ninestar Tech. Co. v. ITC*, 667 F.3d 1373, 1378 (Fed. Cir. 2012).  In so holding, it rejected the argument that *Jazz Photo* had been overruled by *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 632 n.6, 128 S. Ct. 2109, 170 L. Ed. 2d 996 (2008) because neither the facts nor the law in *Quanta* concerned the importation into the United States of a product not made or sold under a United States patent. *Id.*  Thus, while the principles of *Quanta* may be subject to application for products first sold domestically, the Federal Circuit has rejected their application for products first sold overseas.

11

Ed. 2d 613 (2013). That denial of certiorari, while not conclusive, certainly suggests that *Jazz Photo* remains for now the controlling case on whether patent rights are exhausted by a first authorized sale abroad.

In so ruling, however, the Court does not intend to determine that *Jazz Photo* ultimately should stand in light of *Kirtsaeng*. The Court is cognizant that many of the reasons for rejecting a territoriality requirement for copyright law may apply equally to patent law. Nevertheless, given the complete lack of consideration of the context, history and practical implications of international patent exhaustion in *Kirtsaeng*, the Court concludes that the Supreme Court did not intend to implicitly overrule *Jazz Photo* and that *Jazz Photo* remains controlling precedent on patent exhaustion abroad.

IV.     **CONCLUSION**

Accordingly, Impression Products' Motion to Dismiss (Doc. 335) is **DENIED**.

**IT IS SO ORDERED**.

s/Michael R. Barrett
Michael R. Barrett, Judge
United States District Court

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2014, I caused the

foregoing Opening Brief of Plaintiff-Cross Appellant to be electronically filed with

the Clerk of the Court for the United States Court of Appeals for the Federal

Circuit through the Court's CM/ECF system.


/s/ Constantine L. Trela, Jr.
CONSTANTINE L. TRELA, JR.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 28.1(e)(2)(B) and the Rules of this Court, because it contains 13,255 words as determined by the Microsoft 2007 word-processing system used to prepare the brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing system in 14-point Times New Roman font.

/s/ Constantine L. Trela, Jr.
CONSTANTINE L. TRELA, JR.