**RECEIVED**

JUN 05 2015

United States Court of Appeals
For The Federal Circuit

**2014-1617, 2014-1619**

### United States Court of Appeals for the Federal Circuit

Lexmark International, Inc.
*Plaintiff-Cross-Appellant*

v.

Impression Products, Inc.
*Defendant-Appellant*

Quality Cartridges, Inc., John Does 1-20, Blue Trading LLC, Exprint
International, Inc., LD Products, Inc., Printronic Corporation, Tesen
Development (Hong Kong) Co. Ltd., Benigno Adeva and His Companies
*Defendants*

On Appeal from the United States District Court
For the Southern District of Ohio in No. 1:10-cv-00564-MRB
Judge Michael R. Barrett

**Corrected Brief of *Amicus Curiae* Professors Barrett and Abbott
In Support of Neither Party**

Margreth Barrett,
*Emeritus* Professor of Law
University of California,
Hastings College of Law
P.O. Box 347
The Sea Ranch, Ca. 95497
(707) 785-2109

Frederick M. Abbott
Edward Ball Eminent Scholar
Professor of International Law
Florida State University College of
Law
425 W. Jefferson St.
Tallahassee, Fl. 32301
(850) 644-1572

## CERTIFICATE OF INTEREST

Amicus Curiae, Margreth Barrett and Frederick Abbott, certify the following:

1. The full name of all parties represented by this brief are:  Margreth Barrett and Frederick M. Abbott

2. The name of the real party interest: Not applicable

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented: None

4.  The names of all law firms and partners or associates that appeared for the parties now represented that are expected to appear in this court are: The only persons associated with this amicus curiae brief are Margreth Barrett, Emeritus Professor of Law at the University of California Hastings College of Law, and Frederick M. Abbott, Edward Ball Eminent Scholar Professor of International Law, Florida State University College of Law.     June 2, 2015

Margreth Barrett,
Emeritus Professor of Law
University of California
Hastings College of Law
P.O. Box 347
The Sea Ranch, CA 95497

Frederick M. Abbott
Edward Ball Eminent Scholar
Professor of International Law
Florida State University College of
Law
425 W. Jefferson St.
Tallahassee, Fl. 32301

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF INTEREST OF AMICUS CURIAE . . . . . . . . . . . . . . . . . . . . . . . . vii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    HISTORICALLY, THE COMMON LAW HAS REJECTED A TERRITORIAL
      LIMITATION TO THE DOCTRINE OF PATENT EXHAUSTION . . . . . . . . . . . 2

II.   THE SUPREME COURT, IN *BOESCH,* DID NOT CHANGE THE
      COMMON LAW RULE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.  CONGRESS HAS NOT LEGISLATED A DIFFERENT PATENT
      EXHAUSTION RULE, AND CAN BE UNDERSTOOD TO HAVE
      RATIFIED THE PRE-*JAZZ* COMMON LAW RULE . . . . . . . . . . . . . . 11

IV.   IMPOSING A TERRITORIAL LIMITATION ON PATENT
      EXHAUSTION RAISES THE SAME PRACTICAL PROBLEMS
      ENVISIONED BY THE SUPREME COURT IN *KIRTSAENG* . . . . . . . . 13

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TABLE OF AUTHORITIES

<u>Cases</u>

*B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F. 3d 1419, 1426
(Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

*Boesch v. Graff*, 133 U.S. 697 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7 n. 5, 9-10

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989). . . . . . . . . . . . 3

*Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.*,
266 F. 71 (2d Cir. 1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 10

*Dickerson v. Matheson*, 57 F. 524 (2d Cir. 1893). . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Dickerson v. Tinling*, 84 F. 192 (8th Cir. 1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Featherstone v. Ormonde Cycle Co.*, 53 F. 110, 111 (S.D.N.Y. 1892) . . . . . . . . . . 8

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Griffin v. Keystone Mushroom Farm, Inc.*, 453 F. Supp. 1283
(E.D.Penn. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4 n. 2

*Holiday v. Mattheson*, 24 F. 185 (C.C.S.D.N.Y. 1885) . . . . . . . . . . . . . . . . . . . . . . 5

*Jazz Photo Corp. v. International Trade Commission*, 264 F.3d 1094
(Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 4 n. 2,
9, 10, 12, 13, 15, 16

*Kabushiki Kaisha Hattori Seiko v .Refac Tech. Dev. Corp.*, 690 F. Supp.
1339 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7 n. 3

*Kendal v. Winsor*, 62 U.S. (21 How.) 322, 329 (1858) . . . . . . . . . . . . . . . . . . . . . . 3

*Keeler v. Standard Folding-Bed*, 157 U.S. 659 (1895). . . . . . . . . . . . . . . . . . . . 2, 3

*Kirtsaeng v. John Wiley & Sons, Inc.,* 133 S.C. 1351 (2012) . . . . . . . . 1, 2, 13, 14,
    15, 16

*Microsoft v. AT&T,* 550 U.S. 437 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11 n.7

*Quanta Computers v. LG Electronics,* 553 U.S. 617 (2008) . . . . . . . . . . . . . . . . 15

*Sanofi S.A. v. Med-Tech Veterinarian Products, Inc.,* 565 F. Supp. 931
    (S.D.N.J. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7 n. 4, 10

*United States v. Masonite Corp.,* 316 U.S. 265 (1942) . . . . . . . . . . . . . . . . . . . 3, 4

*United States. v. Univis Lens Co.,* 316 U.S. 241, 250-252 (1942) . . . . . . . . . . . . .4

## Statutes and Legislative History

Uruguay Round Agreements Act, Pub. L. No. 103-465, §§ 532, 533,
108 Stat. 4809, 4983-90 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2, 11,
12, 13, 13 n. 8

<u>Message from the President of the United States Transmitting the Uruguay
Round Trade Agreements, Texts of Agreements Implementing Bill, Statement
of Administrative Action and Required Supporting Statements</u>, H.R. Doc. No.
316, 103d Cong., 2d Sess. (1994), *reprinted in*1994 U.S.C.C.A.N. 4040 . . . . 11,
12, 13

## International Treaties

Agreement on Trade-Related Aspects of Intellectual Property Rights, Marrakesh
Agreement Establishing the World Trade Organization, Annex 1C, Apr. 15, 1994,
in WORLD TRADE ORGANIZATION, THE LEGAL TEXTS: THE RESULTS OF THE
URUGUAY ROUND OF MULTILATERAL TRADE NEGOTIATIONS 321 (1999) . . . . . . . . . .11

Declaration on the TRIPS Agreement and Public Health (Nov. 14, 2001), Doc.
WT/MIN(01)/DEC/2 (Nov. 20, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13 n. 9

## Other Authorities

Frederick M. Abbott, *First Report (Final) to the Committee on International Trade Law of the International Law Association on the Subject of Parallel Importation*, 1 JIEL 607, 608 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4 n. 1

Margreth Barrett, *The United States' Doctrine of Exhaustion: Parallel Imports of Patented Goods,"* 27 N Ky. L. Rev. 911, 945-49 (2000), *reprinted in* 32 *Intell. Prop. Rev.* 231 (West, 2001). . . . . . . . . . . . . . . . . . . . . . 4 n. 2

## **STATEMENT OF INTEREST OF AMICUS CURIAE**

Amicus Curiae Professors Margreth Barrett and Frederick M. Abbott, who are filing pro se, both teach and engage in scholarship related to intellectual property and international law issues, and have done so for many years. Their sole interest in this case is to promote sound and balanced rules for United States patent law.

Authority to file this brief is derived from this Court's statement, in its April 14, 2015 *en banc* briefing order, that "[o]ther briefs of amici curiae will be entertained, and any such amicus briefs may be filed without consent and leave of court".

Neither Prof. Barrett nor Prof. Abbott has a relationship with any party to this litigation, or any stake in the result of this case. No party's counsel authored the brief, either in whole or in part. No party or party's counsel contributed money to fund preparing or submitting this brief. Professor Abbott's employer, Florida State University supported the submission of this brief with secretarial assistance, means for reproducing the brief, and postage.

## SUMMARY OF ARGUMENT

In its opinion below, the District Court reasoned that the Supreme

Court's rejection of territorial limits on exhaustion in *Kirtsaeng v. John Wiley &*

*Sons, Inc.*, __ U.S. __, 133 S.Ct. 1351 (2012), may not overrule the territorial

exhaustion limitation adopted in *Jazz Photo Corp. v. International Trade*

*Commission*, 264 F.3d 1094 (Fed. Cir. 2001), because, while the copyright and

patent doctrines of exhaustion sprang from the same source and line of

reasoning, intervening patent decisions and/or Congressional action might

dictate a different scope for the modern patent doctrine of exhaustion: The

*Kirtsaeng* court focused on copyright-specific case law, the statutory language

of the Copyright Act, and practical considerations that might differ in the case

of patents. This brief will address the questions whether patent case law,

Congressional action, or practical concerns support a different scope of

exhaustion in copyright and patent cases, concluding that, (I) in the one

hundred-plus years prior to this Court's decision in *Jazz Photo*, the patent case

law regularly rejected arguments for a territorial limitation to patent

exhaustion, and (II) the Supreme Court's decision in *Boesch v. Graff*, 133 U.S.

697 (1890), is completely consistent with that earlier line of case opinions.

Moreover, (III) Congress has taken no action to impose a territorial limit to

patent exhaustion, and indeed, the legislative history of the Uruguay Round

Agreements Act, 103-465, 108 Stat. 4809 (1994), expressly stated an intention to retain the existing, pre-*Jazz Photo* common law rule. Finally, (IV) the same practical concerns that the *Kirtsaeng* Court cited exist in the case of patents. Thus, *Kirtsaeng* should be read to reject territorial limitations to the doctrine of exhaustion in both copyright and patent law.

## ARGUMENT

### I. Historically, the Common Law Has Rejected a Territorial Limitation To the Doctrine of Patent Exhaustion

Court decisions have explained the underlying purpose of the exhaustion doctrine in U.S. patent law. The doctrine reflects the law's general avoidance of restraints on alienation, and the interference such restraints impose on a free market. As the Supreme Court has put it: a failure to find a patentee's rights exhausted after the first sale would constitute an "inconvenience and annoyance to the public . . . too obvious to require illustration". *Keeler v. Standard Folding-Bed*, 157 U.S. 659, 666-667 (1895). Moreover, the doctrine reflects the traditional understanding in U.S. law that intellectual property rights are limited rights afforded to individuals not by virtue of any natural right in their creations, but for the specific purpose of accomplishing a pragmatic goal: promotion of the general public welfare. *See Graham v. John Deere Co.*, 383 U.S. 1 (1966). American

patent law is built on the presumption that the public benefits from a robust,

competitive marketplace. Granting patent rights to individual inventors promotes

such a marketplace by providing an incentive to create, leading individuals to

produce a greater selection of goods and services for sale. However, the rights

afforded to patentees must be limited to those necessary to provide the desired

incentive. By their nature, patent rights restrict public access to the goods and

services to which they attach. If the rights are not adequately limited, they may

encumber, rather than enhance, a competitive marketplace. Accordingly, patent

law is designed to attain a balance of rights and limitations that effectively

provides an incentive to create, while minimizing interference in the marketplace.

*See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989). Thus the

U.S. doctrine of exhaustion contemplates that the patentee will have exclusive

control over the first sale of products embodying the invention, and that this should

be sufficient to ensure that there is a financial incentive to invest in the creative

process. *See generally United States v. Masonite Corp.,* 316 U.S. 265, 277-280

(1942); *Kendal v. Winsor,* 62 U.S. (21 How.) 322, 329 (1858); *Keeler v. Standard

Folding-Bed Co.*, *supra*, at 665-667. As the Supreme Court has stated:

> The declared purpose of the patent law is to promote the progress of science
> and the useful arts by granting to the inventor a limited monopoly, the
> exercise of which will enable him to secure the financial rewards for his
> invention.
>     Our decisions have uniformly recognized that the purpose of the
> patent law is fulfilled with respect to any particular article when the patentee

has received his reward for the use of his invention by the sale of the article, and that once that purpose is realized the patent law affords no basis for restraining the use and enjoyment of the thing sold.

*U.S. v. Univis Lens Co.,* 316 U.S. 241, 250-252 (1942). *See also United States v. Masonite Corp., supra,* at 278; *B. Braun Medical, Inc. v. Abbott Laboratories,* 124 F. 3d 1419, 1426 (Fed. Cir. 1997).

When parallel imports were involved,[1] U.S. courts routinely[2] found that the applicability of the patent doctrine of exhaustion turned not on *where the patented goods were made or sold,* but on *who made or sold them.* As long as it was the U.S. patentee who originally sold or authorized the sale of the patented goods abroad, the courts applied the doctrine of exhaustion and allowed the goods subsequently to enter the U.S. without the patentee's authorization. Courts would only prohibit the importation if the U.S. patentee could demonstrate an enforceable

---

[1] With respect to patents, "parallel imports" refer to import goods patented in the importing country (here, the United States), when such goods are first placed on the market outside that country under the authority of the patent owner. See Frederick M. Abbott, *First Report (Final) to the Committee on International Trade Law of the International Law Association on the Subject of Parallel Importation,* 1 JIEL 607, 608 (1998).

[2] Prior to the Federal Circuit's decision in the *Jazz Photo* case, only one reported decision found the doctrine of exhaustion inapplicable to goods, simply because they were sold abroad. *Griffin v. Keystone Mushroom Farm, Inc.,* 453 F. Supp. 1283 (E.D.Penn. 1978). This decision evidences no awareness of the Circuit-level and other decisions to the contrary, discussed *infra,* and is subject to criticism on several levels. See Margreth Barrett, *The United States' Doctrine of Exhaustion: Parallel Imports of Patented Goods,"* 27 N Ky. L. Rev. 911, 945-49 (2000), *reprinted in* 32 *Intell. Prop. Rev.* 231 (West, 2001).

contract restriction prohibiting the defendant from bringing the goods into the country. *See, e.g., Dickerson v. Matheson,* 57 F. 524 (2d Cir. 1893); *Curtiss Aeroplane & Motor Corp. v. United Aircraft Engineering Corp.,* 266 F. 71 (2d Cir. 1920); *Kabushiki Kaisha Hattori Seiko v. Refac Tech. Dev. Corp.,* 690 F. Supp. 1339 (S.D.N.Y. 1988).

This rule was first stated by the court in *Holiday v. Mattheson,* 24 F. 185 (C.C.S.D.N.Y. 1885). In that case the court found that the doctrine of exhaustion prohibited a US. patentee, who had sold its patented product in England without restrictions or conditions, from recovering against a defendant who purchased the product from one of the patentee's English vendees and brought it to the United States. The court noted that when the owner sells any article without reservations, the purchaser "acquires the whole right of the vendor in the thing sold", and passes that right on to subsequent purchasers. The vendor may not subsequently restrict the purchaser "to using the thing bought in a particular way, or in a particular place, for a limited period of time, or from selling his rights to others". The court explained that the fact that the item sold was patented did not change this result: "if the vendor sells without reservation or restriction, he parts with his monopoly so far as it can in any way qualify the rights of the purchaser." *Id.*, at 78-79.

The Court of Appeals for the Second Circuit adopted this reasoning several years later in *Dickerson v. Matheson*, *supra*, stating unequivocally:

> A purchaser in a foreign country, of an article patented in that country and also in the United States, from the owner of each patent, or from a licensee under each patent, who purchases without any restrictions upon the extent of his use or power of sale, acquires an unrestricted ownership in the article, and can use or sell it in this country.

*Id, at* 527. A quarter of a century later the Second Circuit reaffirmed its application of the doctrine of exhaustion to parallel imports. In *Curtiss Aeroplane, supra,* the plaintiff owned U.S. and Canadian patents for airplane-related inventions. During the First World War, the plaintiff licensed the British Government to have airplanes incorporating the patented inventions built in Canada for British use in the war. After the war, the British Government sold some of the airplanes to the defendant, who imported them into the United States for resale. The plaintiff sued the defendant for infringement of its U.S. patents. In finding for the defendant, the Second Circuit explained:

> If a patentee or his assignee sells a patented article, that article is freed from the monopoly of any patents which the vendor may possess. If the thing sold contains inventions of several United States patents owned by the vendor, the article is freed from each and all of them; and if the vendor has divided his monopoly into different territorial monopolies, his sale frees the article from them all. If the vendor's patent monopoly consists of foreign and domestic patents, the sale frees the article from the monopoly of both his foreign and his domestic patents, and where there is no restriction in the contract of sale the purchaser acquired the complete title and full right to use and sell the article in any and every country.

266 F. at 77-78. Subsequent decisions from the District Court for the Southern

District of New York[3] and the District Court for the Southern District of New

Jersey[4] followed the Second Circuit's lead.

In *Curtiss Aeroplane*, the Second Circuit distinguished earlier cases finding

that a U.S. patentee's rights were unexhausted by foreign sales of goods embodying

the invention. In those cases, the court found, there had been "no participation

whatever by the owner of the patent, either as a party or as a privy, in the putting

out of the article which is alleged to infringe". 266 F. at 77. The doctrine of

exhaustion would only apply when the foreign purchaser derived the patented

product through the U.S. patentee or the patentee's licensees.[5] Likewise, in

*Dickerson v. Tinling*, 84 F. 192 (8th Cir. 1897), the U.S. Court of Appeals for the

---

[3] *See Kabushiki Kaisha Hattori Seiko v. Refac Technology Development Corp.*, *supra.*
In that case the court noted:

> "In general, the first sale of a product by a patentee or licensee exhausts the
> patent monopoly, and deprives the holder of patent rights of any further control
> over resale of the product. This principle applies to an authorized first sale
> abroad by a patentee or licensee who also has the right to sell in the United
> States. Following such a sale, the holder of United States patent rights is barred
> from preventing resale in the United States or from collecting a royalty when
> the foreign customer resells the article here"

690 F. Supp. at 1342.

[4] *Sanofi S.A. v. Med-Tech Veterinarian Products, Inc.*, 565 F. Supp. 931, 938
(S.D.N.J. 1983)("The court will . .. not grant to Sanofi an injunction against
distribution in this country of the product that it sold in France without restriction").

[5] The U.S. Supreme Court also made this clear in *Boesch v. Graff*, 26 133 U.S. 697
(1890), which is discussed in the next section.

7

Eighth Circuit emphasized that the doctrine of exhaustion will only apply when the

U.S. patentee or its licensee made or authorized the first sale:

> [O]ne who purchases in a foreign country, of others than the owners of the
> United States patent or their vendees, pays nothing, either directly or
> indirectly, to the owners of the patent, and therefore he acquires no right to
> make, use, or vend the article which he buys within the territorial limits of
> their monopoly.

*Id.,* at 194. *See also Featherstone v. Ormonde Cycle Co.,* 53 F. 110, 111 (S.D.N.Y.
1892).

The rationale underlying this limitation of the doctrine of exhaustion is self-

evident. As noted above, in the United States, the doctrine of exhaustion is based

on the premise that a patent should secure the benefit of the invention to the

patentee, to provide an incentive to invent. However, the patentee should only

benefit once in connection with any particular product. Once the patentee has

enjoyed control of the first sale, its rights as to that article are exhausted. If the

patentee did not make or authorize the initial sale of the patented article, it never

enjoyed control as to that article, and its rights were never exhausted. On the other

hand, if the patentee did control the initial sale of the product, either by selling the

product itself or by receiving the right to a royalty payment from an authorized

licensee-vendor, then the doctrine of exhaustion should apply, regardless of

whether the sale was made within the geographic territory of the U.S. patent. One

way or the other, the patentee received the benefit of the sale. It is within the

patentee's discretion to determine where to first sell its patented product.

8

## II. The Supreme Court, In *Boesch,* Did Not Change the Common Law Rule

The only precedent the *Jazz Photo* court cited in support of its adoption of

territorial exhaustion was *Boesch v. Graff,* 133 U.S. 697 (1890). However, the

*Boesch* decision provides no support for territorial exhaustion. *Boesch* involved

lamps falling within U.S. patent claims, which were made and sold in Germany by

a party who was unrelated to the U.S. patentee and derived no rights from him. The

U.S. patentee also held a patent for the lamp in Germany, but German law

exempted the seller from infringement liability under the German patent because

he was a "prior user" of the invention.[6] The *Boesch* Court merely held that the

German prior user law did not exempt persons importing the lamps into the United

States from infringement liability under the U.S. patent:

> The right which [the German seller] had to make and sell the burners in
> Germany was allowed him under the laws of that country, and purchasers
> from him could not be thereby authorized to sell the articles in the United
> States in defiance of the rights of patentees under a United States patent. . ..
> The sale of articles in the United States under a United States patent cannot
> be controlled by foreign laws.

133 U.S. 697. Thus, while the initial sale of the lamps may have been legal in

Germany, that in itself did not make the subsequent import of the lamps into the

---

[6] The German law provided that a German Patent would not affect "persons who, at
the time of the patentee's application, have already commenced to make use of the
invention in the country, or made the preparations requisite for such use." *Boesch,* at
701.

9

United States legal. Only U.S. law could determine that. The defendants were liable for infringement in *Boesch*, but that result is entirely consistent with the rule of international exhaustion long recognized by U.S. courts. The U.S. patentee's rights were not exhausted by the initial sale of the lamps because the U.S. patentee did not sell them or authorize their sale. The U.S. doctrine of exhaustion is triggered *not* by a legal first sale *per se*, but by a first sale made by the U.S. patentee or its licensees. Thus *Boesch* does not stand for the proposition that U.S. law exempts all foreign sales from the doctrine of exhaustion. It merely stands for the proposition that foreign sales by third parties who derive no rights from the U.S. patentee do not exhaust the U.S. patentee's rights, regardless of whether the sales were legal in the country in which they occurred.

In applying the rule of international exhaustion in *Curtiss Aeroplane,* the Second Circuit distinguished *Boesch* on the ground that there had been "no participation whatever by the owner of the patent, either as a party or as a privy, in the putting out of the article which [was] alleged to infringe". 266 F. at 77. The District Court in *Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc., supra,* also found *Boesch* irrelevant to the question of international exhaustion:

> In *Boesch*, it was not the patentee who made the sale abroad. In fact, it was not even a licensee of the patentee who made the sale. . . . Under the circumstances of *Boesch*, the patentee neither received compensation for the use of his invention, nor consented to its importation into this country.

10

565 F. Supp. at 937-38.[7]

### III. Congress Has Not Legislated a Different Patent Exhaustion Rule, and Can Be Understood to Have Ratified the Pre-*Jazz* Common Law Rule

Congress amended the United States' Patent Act to provide patentees an express right of importation, which became effective January 1, 1996. The Uruguay Round Agreements Act, Pub. L. No. 103-465, §§ 532, 533, 108 Stat. 4809, 4983-90 (1994). Congress added the importation right in order to bring the United States into compliance with Article 28 of the Agreement on Trade-Related Aspects of Intellectual Property Rights, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, Apr. 15, 1994, in WORLD TRADE ORGANIZATION, THE LEGAL TEXTS: THE RESULTS OF THE URUGUAY ROUND OF MULTILATERAL TRADE NEGOTIATIONS 321 (1999) (hereafter, "TRIPS"). The implementing legislation made no reference to the doctrine of exhaustion, or to any other limitation on the scope of the new importation right. Thus, in determining the applicability of the doctrine of exhaustion to the new statutory importation

---

[7] The U.S. Supreme Court has consistently made reference to the fact that the U.S. patent system does not have extraterritorial effect absent a clear directive from Congress. See, e.g., *Microsoft v. AT&T*, 550 U.S. 437, 455 (2007), stating "The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law." The exhaustion/parallel importation issue does *not* involve the prospective application of U.S. law to regulate activity in foreign countries. Instead, it involves the application of U.S. law to regulate acts in and affecting the United States, i.e. importation, taking into account the context of sales occurring abroad, i.e. authorized first sales by owners of U.S. patents. There is no potential intrusion on foreign law or foreign sovereign prerogative.

right, resort must be had to the legislative history of the amendments. While the reports that Congress drafted to accompany the Uruguay Round Agreements Act do not refer to the doctrine of exhaustion, the President's Statement of Administrative Action, which accompanied the TRIPS implementing legislation under the House and Senate's special "fast track" procedural rules, does. Message from the President of the United States Transmitting the Uruguay Round Trade Agreements, Texts of Agreements Implementing Bill, Statement of Administrative Action and Required Supporting Statements, H.R. Doc. No. 316, 103d Cong., 2d Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040. (Hereafter "Statement") The Statement of Administrative Action notes that the TRIPS Agreement "requires few changes in United States law and regulations and does not affect United States law or practice relating to parallel importation of products protected by intellectual property rights." *Id.*, at 981, 1994 U.S.C.C.A.N. at 4280. Further into its report, the Statement lists the changes to existing law deemed "required or appropriate" to implement TRIPS and notes:

> "[o]ther areas of United States intellectual property law are unaffected by the Agreement on TRIPs. For example, the Agreement does not require any change in current United States law or practice with respect to parallel importation of goods that are the subject of intellectual property rights."

*Id.*, at 990-91, 1994 U.S.C.C.A.N. at 4287. Clearly the Uruguay Round Agreements Act did not itself change the common-law rule of patent exhaustion existing at that time (prior to the *Jazz Photo* decision), and the clear implication of

12

the <u>Statement of Administrative Action</u> is that the doctrine of exhaustion, as

defined, would extend to the new importation right, as well as to the pre-existing

use and sale rights. Because of the particular nature of the fast track

implementation procedure, the <u>Statement of Administrative Action</u> should carry

significant weight in interpreting the Uruguay Round Agreement Act

amendments,[8] and, combined with Congress' failure to legislatively change the

rule during the 100-plus years preceding the *Jazz Photo* decision, should indicate

Congressional ratification, or at least acquiescence, with regard to the common-law

rejection of a territoriality limit.[9]

## IV. Imposing a Territorial Limitation on Patent Exhaustion Raises the Same Practical Problems Envisioned by The Supreme Court in *Kirtsaeng*

---

[8] Congress approved the <u>Administrative Statement</u> when it implemented the Uruguay Round Agreements Act. Uruguay Round Agreements Act, Pub. L. No. 103-465 § 101(a), 108 Stat. 4809, 4814 (1994). Section 102(d) of the Act provides that
> "[t]he statement of administrative action approved by the Congress under section 101(a) shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."

Pub. L. No. 103-465, §102(d), 108 Stat. at 4819.

[9] In respect to consistency with international legal obligations of the United States, the TRIPS Agreement, as expressly confirmed in paragraph 5(d) of the Doha Declaration on the TRIPS Agreement and Public Health, does not preclude any WTO Member from adopting international exhaustion of patent rights. Declaration on the TRIPS Agreement and Public Health (Nov. 14, 2001), Doc. WT/MIN(01)/DEC/2 (Nov. 20, 2001).

13

In rejecting a territorial limitation to copyright exhaustion, the *Kirtsaeng* Court emphasized the practical difficulties such a limitation would impose, both on businesses and commerce, and on the courts. Justice Breyer noted the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods, and the selective enforcement inherent in any such effort. *Kirtsaeng,* 133 S.Ct. at 1363. He also noted the problems that application of a geographically constrained exhaustion rule would impose on the international supply chain:

> "automobiles, microwaves, calculators, mobile phones, tablets, and personal computers" contain copyrightable software programs or packaging. Many of these items are made abroad with the American copyright holder's permission and then sold and imported (with that permission) to the United States. A geographical interpretation would prevent the resale of, say, a car, without the permission of the holder of each copyright on each piece of copyrighted automobile software. Yet there is no reason to believe that foreign auto manufacturers regularly obtain this kind of permission from their software component suppliers * * *. Without that permission a foreign car owner could not sell his or her used car.
> Retailers tell us that over $2.3 trillion worth of foreign goods were imported in 2011. American retailers buy many of these goods after a first sale abroad. And, many of these items [have copyrighted aspects]. A geographical interpretation would subject many, if not all, of them to the disruptive impact of the threat of infringement suits.

*Id.,* at 136 (citations omitted). The same practical problems would arise under a territorial limitation to the patent doctrine of exhaustion: Many of the same products described above include not just copyrighted components, but also patented components made and sold abroad under the authority of the U.S. patent

holder. Manufactured goods, such as computers, are today produced through a global supply chain, incorporating parts procured from a multiplicity of countries. A computer arriving in the United States may have been produced under authority of multiple independent patent owners in a number of countries. Those multiple independent patent owners may well have parallel patents in the United States. It will be exceedingly difficult for a purchaser of parts and components to determine whether each part was sold free of subsequent patent claims that might be asserted in the United States or elsewhere. In principle, virtually every manufactured good arriving in the United States would be subject to claims from component patent owners, even if those components were sold under authority of the patentee in a foreign country. Certainly the disruptions to commerce and the public identified in *Kirtsaeng* are of as much concern under patent law as under copyright law. Indeed, the potential problem of "downstream control" by patent owners of goods in commerce subject to multiple patents was at the policy heart of the Supreme Court's decision in *Quanta Computers v. LG Electronics*, 553 U.S. 617 (2008).

## V. Conclusion

Prior to the Federal Circuit's decision in *Jazz Photo,* over a hundred years of case law rejected territorial limits on the patent doctrine of exhaustion. While the Supreme Court did not address the specific issue, the Supreme Court's decisions

regarding the doctrine of exhaustion are consistent with the international exhaustion rule adopted by the lower courts. Congress has done nothing to modify the pre-*Jazz* common-law rule, and indeed may be seen as expressly ratifying it. The problems for courts and commerce that the *Kirtsaeng* decision associated with a territorial limit to copyright exhaustion exist just as strongly in the patent context. Particularly in light on the *sua sponte* nature of the Court's adoption of territorial exhaustion in *Jazz Photo*, this *En Banc* Court should reverse that earlier decision and find, in line with the Supreme Court's decision in *Kirtsaeng,* that exhaustion of patent rights is not limited to sales first made in the United States.

## **CERTIFICATE OF COMPLIANCE**

1.  This corrected brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) and because it contains under 5,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.  This corrected brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

Dated: June 2, 2015

Margreth Barrett
Professor Emeritus of Law
University of California
Hastings College of Law
P.O. Box 347
The Sea Ranch, Ca. 95497
(707) 875-2109

Frederick M. Abbott
Edward Ball Eminent Scholar
Professor of International Law
Florida State University College
of Law
425 W. Jefferson St.
Tallahassee, Fl. 32301
(850) 644-1572

## CERTIFICATE OF SERVICE

We, the undersigned, herby certify that on June 5, 2015, a true and correct copy of the forgoing Corrected Brief of *Amicus Curiae* Professors Barrett and Abbott In Support of Neither Party was served on counsel of record in *Lexmark International, Inc v. Impression Products, Inc.* No. 2014-1617, 2014-1619. Service was made by United Parcel Service to:

Timothy C. Meece
Banner & Witcoff, Ltd.
Ten South Wacker Drive
Suite 3000
Chicago, Ill. 60606-7407

Steven Brian Loy
Stoll Keenon Ogden PLLC
300 West Vine St.
Suite 2100
Lexington, Ky. 40507-1801

Benjamin J. Beaton
Sidley Austin LLP
1501 K Street, NorthWest
Washington, D. C. 20005

Constantine L. Trela Jr.
Sidley Austin LLP
One South Dearborn
Chicago, Ill. 60603

Edward F. O'Connor
The Eclipse Group LLP
2020 Main Street
Suite 600
Irvine, Ca. 92614

Dated: June 5, 2015

Margreth Barrett
Professor Emeritus of Law University
of California Hastings College of Law
P.O. Box 347
The Sea Ranch, Ca. 95497
(707) 875-2109

Frederick M. Abbott
Edward Ball Eminent Scholar
Professor of International Law
Florida State University College
of Law
425 W. Jefferson St.
Tallahassee, FL 32301
(850) 644-1572